(293 P.3d 787)
No. 105,415

STATE OF KANSAS, *Appellee*, v. SEAN ARNELL HARGROVE, *Appellant*.

Opinion filed February 1, 2013.

*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.

*Andrew J. Dufour*, legal intern, *Steven J. Obermeier*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before GREEN, P.J., ATCHESON and BRUNS, JJ.

ATCHESON, J.: This case presents a confounding question on the scope of the invited error doctrine: Should the doctrine extinguish a criminal defendant's appeal of a conviction when that challenge rests on a constitutional defect arising from actions the defendant's lawyer asked the district court to take? In this case, the lawyer for Defendant Sean Arnell Hargrove requested and the Johnson County District Court gave a jury instruction that omitted substantive and contested elements of the charged offense—an error compromising the constitutional right to trial by jury. On balance, policy considerations and the weight of authority favor applying invited error to bar Hargrove's point in this direct appeal because the record fails to establish whether the request was tactical or inadvertent. We come to that conclusion with the understanding that Hargrove ought to be able to secure judicial review of the lawyer's actions in a motion for habeas corpus relief.

On appeal, Hargrove also contends the State failed to present sufficient evidence to support his conviction for attempted aggravated burglary. The record evidence, though something less than overwhelming, furnishes a legally adequate basis for the verdict. We, therefore, affirm Hargrove's conviction.

## FACTS AND PROCEDURAL HISTORY

After a late morning workout on April 26, 2010, John Geither was showering at his home on a relatively secluded residential street in Shawnee when the doorbell rang about 10 times. Geither toweled off, set the home's alarm system, and looked out an upstairs front window. He saw a stranger walking away from the front door toward a car parked on the street. The stranger turned out to be Hargrove. Geither assumed the individual was leaving, so he finished getting ready for his day.

Almost immediately, Geither heard the doorbell ring again and the front door handle turn. He called 911 to report a possible break-in. While Geither was on the phone with the 911 dispatcher, he heard pounding or thumping sounds at the side of the house near the telephone and security alarm box. Geither remained on the line with the dispatcher.

Shawnee Police Sergeant Ben Mendoza arrived about 8 minutes after Geither placed the call. Officer Thomas Rhomberg got there at almost the same time. Mendoza saw Hargrove getting into a sedan, so he pulled up and activated the emergency lights on his patrol car. Rhomberg then positioned his patrol car to block Hargrove's vehicle. After doing so, Rhomberg spoke with Hargrove. Hargrove said he did not know who lived in the house but had stopped to ask for directions. Rhomberg looked in the sedan and saw a pair of white cotton gloves and a Phillip's-head screwdriver. At some point, the officers formally arrested Hargrove, although the trial transcript is less than clear as to when.

Rhomberg walked around Geither's house and saw the telephone box had been pulled away from the outside wall, the mounting brackets broken, and several wires jerked loose. He also noticed a partial shoeprint in the dirt beneath the telephone box. The shoeprint was preserved and later compared to Hargrove's footwear. At trial, a forensic examiner from the Kansas Bureau of Investigation testified the shoeprint was consistent with Hargrove's boots in terms of size and general characteristics. But the examiner told the jury the print lacked sufficient detail to conclude it matched Hargrove's boots.

Rhomberg also saw pry marks on a sliding glass door at the rear of Geither's house. He then unsuccessfully looked for a tool that could have been used to make the marks. At trial, a detective testified that the screwdriver found in Hargrove's car was inconsistent with the pry marks and was not used to jimmy the door.

Geither testified that neither the telephone box nor the back door had any damage the day before he saw Hargrove and called the police.

A Shawnee detective interviewed Hargrove at the police station. Hargrove told the detective he lived in Kansas City, Missouri, and had a job interview at a warehouse there. But he could not remember the name of the company. Hargrove explained that he drove to the Kansas side for another job interview, although he could not remember the name of that company either. The trial evidence showed that the corporate offices of Deffenbaugh Disposal Services, a business that has a large unskilled workforce, is in the general vicinity of Geither's home. Hargrove repeated that he had become lost in the residential area and went to Geither's house to get directions. In response to the detective's questions, Hargrove acknowledged he saw nothing indicating anyone might be in Geither's house, such as a car in the driveway. He also agreed he had not gone to the neighboring house in search of directions after getting no response at Geither's home. Hargrove explained to the detective that he had decided he could find his way out of the residential area. Hargrove told the detective he had stopped for about 3 minutes and did not go to the side or back of Geither's house.

The State charged Hargrove with one count of attempted aggravated burglary, in violation of K.S.A. 31-3301 and K.S.A. 21-3716, and misdemeanor criminal damage to property, in violation of K.S.A. 21-3720. At trial, the prosecutor presented Hargrove's statements to the detective as part of the State's case. Mendoza and Rhomberg recounted the circumstances of their encounter with Hargrove. Both testified that Hargrove did not ask them for directions when they first approached him. Hargrove chose not to testify and presented no evidence.

The district court gave the following instruction to the jury as setting forth the elements of attempted aggravated burglary:

"JURY INSTRUCTION NO. 10

"The defendant is charged in count I with the crime of an attempt to commit aggravated burglary. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

1. That the defendant performed an overt act toward the commission of the crime of aggravated burglary;

2. That the defendant did so with the intent to commit the crime of aggravated burglary;

3. That the defendant failed to complete commission of the crime of aggravated burglary; and

4. That this act occurred on or about the 26th day of April, 2010, in Johnson County, Kansas.

"An overt act necessarily must extend beyond mere preparations made by the accused and must sufficiently approach consummation of the offense to stand either as the first or subsequent step in a direct movement toward the completed offense. Mere preparation is insufficient to constitute an overt act.

"The elements of the completed crime of aggravated burglary are as follows:

1. That the defendant knowingly entered or remained in a residence;

2. That the defendant did so without authority;

3. That the defendant did so with the intent to commit a theft;

4. That at the time there was a human being in the residence; and

5. That this act occurred on or about the 26th day of April, 2010, in Johnson County, Kansas."

The State requested an instruction that substantively matched the one the district court used. So did Hargrove. The instruction Hargrove requested had slightly different introductory wording, but the operative legal language was identical. The proposed instructions and the instruction given the jury omitted the elements of theft.

The jury convicted Hargrove of attempted aggravated burglary and acquitted him of criminal damage to property. Based on his extensive criminal history, Hargrove faced presumptive imprisonment. The district court imposed an aggravated guidelines sentence of 31 months in prison on Hargrove. Hargrove has timely appealed on grounds that the jury instruction on attempted aggravated burglary omitted essential elements of the offense, thereby

depriving him of a fair trial, and that the evidence failed to support the jury's verdict of guilty on that charge.

## INVITED ERROR SUPPLANTS CONSTITUTIONAL DEFECT IN JURY INSTRUCTION

For his first issue on appeal, Hargrove submits the jury instruction on attempted aggravated burglary omitted contested elements of the offense, creating a constitutional error infecting his right to jury trial. He correctly assesses the problem with the instruction—the elements of theft are missing. But Hargrove, through his counsel, invited the error because he requested the deficient instruction. The procedural posture of this case creates a tension between remedying a trial mistake eroding a criminal defendant's fundamental rights and enforcing the invited error doctrine preventing a party from crying foul based on his or her deliberate manipulation of that trial process. We have found no controlling authority from either the United States Supreme Court or the Kansas Supreme Court directly addressing and resolving the tension. There may not be a single rule suited to the task. We do not endeavor to fashion one applicable to every situation. Rather, we draw from the available precedent and reach a conclusion tailored to the factual circumstances of this case.

In managing that task, we first look at the nature of the instructional flaw and how it ordinarily would be evaluated in the absence of invited error. We then consider the scope and purpose of the invited error doctrine. Those efforts follow settled paths in the law. Given the gravity of the insult to Hargrove's constitutional rights, the task of reconciling them does not.

The reconciliation we reach in this direct appeal properly elevates the invitation of the error to preeminence notwithstanding the undeniable significance of the right compromised through the error. To do otherwise here would permit Hargrove to attack his conviction based on a mistake of the district court that his lawyer plainly helped induce, perhaps with a deliberate tactical purpose. The record on appeal sheds no light on why Hargrove's lawyer asked for a truncated instruction leaving out elements of attempted aggravated burglary. If the decision were one of colorable trial

strategy, then Hargrove should be denied relief. Parties ought not be permitted to speculate on strategic decisions that compromise their rights in hopes of attaining victory from a jury and then seek vindication on appeal based on those decisions after they have failed to yield the desired success.

## 1. *The Nature of the Instructional Error*

In this case, the district court should have included the elements of theft in the instruction outlining what the State had to prove to convict Hargrove of attempted aggravated burglary. That's because burglary and aggravated burglary require the perpetrator enter the premises, in this case a house, with the intent to commit certain specified crimes inside. See K.S.A. 21-3715; K.S.A. 21-3716. Here, the State alleged Hargrove harbored the intent to steal property from the house, so the elements instruction refers to theft. But the instruction then omits the particular elements of theft, leaving the jury without any legal measuring stick for determining that aspect of the attempted aggravated burglary charge. The omission is error. See *State v. Rush*, 255 Kan. 672, Syl. ¶ 5, 877 P.2d 386 (1994); *State v. Linn*, 251 Kan. 797, 802, 840 P.2d 1133 (1992). In both *Rush* and *Linn*, the Kansas Supreme Court held a burglary instruction to be erroneous where it failed to include for the jury's consideration the elements of the offense the defendant intended to commit upon entering the premises. The Kansas Supreme Court recently reaffirmed that principle in a prosecution for a different felony, holding: "When a statute makes the commission of a crime or the intent to commit a crime an element of another crime, the jury instructions must set out the statutory elements of the underlying offense." *State v. Richardson*, 290 Kan. 176, 182-83, 224 P.3d 553 (2010) (citing *Rush*, 255 Kan. at 679; *Linn*, 251 Kan. at 801-02). The pattern jury instructions for burglary, PIK Crim. 3d 59.17, and aggravated burglary, PIK Crim. 3d 59.18, indicate the elements of the intended offense must be included. See PIK Crim. 4th 58.120; PIK Crim. 4th 58.130. The rule would be no different for an attempt, and neither side suggests otherwise.

The omission of an element of a charged offense from an instruction compromises the defendant's right to trial by jury pro-

tected in the Sixth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights. See *Neder v. United States*, 527 U.S. 1, 18, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999); *Linn*, 251 Kan. at 802. It, therefore, erodes a fundamental right. The failure to instruct a jury on an element of a criminal offense may amount to harmless error in some limited circumstances. The United States Supreme Court determined the omission could be treated that way if the element were "uncontested and supported by overwhelming evidence." *Neder*, 527 U.S. at 17. The Kansas Supreme Court adopted that standard in *Richardson*, 290 Kan. at 182-83.

The test for harmlessness is twofold. Not only must the evidence bearing on the omitted element approach the irrefutable, a defendant effectively has to concede that component of the charged crime. Such a concession might be inferred from the absence of contrary evidence or explanation developed in challenging the government's case or offered as part of the defense case. The standard is particularly rigorous. A lesser measure would permit a court to impermissibly supplant the jury's fact-finding duty in a criminal case by substituting its assessment of the evidence on a contested issue. That would be akin to, though less destructive than, directing a verdict for the government in a criminal case—a clear Sixth Amendment violation. See *Neder*, 527 U.S. at 31-33 (Scalia, J., concurring in part and dissenting in part); *Sullivan v. Louisiana*, 508 U.S. 275, 277, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993); *Rose v. Clark*, 478 U.S. 570, 578, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986).

In this case, we are not prepared to say the omission of all the elements of theft from the attempted aggravated burglary instruction could be dismissed as harmless. First, of course, Hargrove contested the notion that he intended to steal from Geither's home. The statements he made to the law enforcement officers about wanting directions put his intent in play. We are, likewise, unwilling to say the evidence was overwhelming, although, as we explain later, it was sufficient to support the conviction, a far less demanding standard.

Hargrove, then, has demonstrated a degradation of his right to jury trial that cannot be set aside as harmless. But the determination of prejudicial error does not end the matter because Hargrove, through his counsel, bore substantial responsibility for the defective jury instruction.

## 2. *The Invited Error Doctrine/Rule*

In broad terms, a party may not invite or prompt error in a case and then complain of that error as a ground for reversing an adverse judgment. *State v. Divine*, 291 Kan. 738, 742, 246 P.3d 692 (2011). The long-standing rule reflects the common-sense notion that parties cannot complain to an appellate court about their own conduct at trial—or that of their lawyers—or about rulings they have asked (or invited) a judge to make. If parties get what they ask for from district court judges, appellate courts will not reverse judgments against them even though they may think better of their requests on appeal. The invited error rule applies in civil and criminal cases. See *State v. Angelo*, 287 Kan. 262, 279-80, 197 P.3d 337 (2008) (criminal); *Butler County R.W.D. No. 8 v. Yates*, 275 Kan. 291, 296, 64 P.3d 357 (2003) (civil). The Kansas Supreme Court described the doctrine in *State v. Smith*, 232 Kan. 128, Syl. ¶ 2, 652 P.2d 703 (1982), this way: "Where a party procures a court to proceed in a particular way and invites a particular ruling, he is precluded from assailing such proceeding and ruling on appellate review."

Invited error crops up occasionally with jury instructions. Parties request legally infelicitous instructions that district courts then give, and when the cases turn out badly, they complain on appeal about the instructional error. See *State v. Bailey*, 292 Kan. 449, 459, 255 P.3d 19 (2011); *State v. Schreiner*, 46 Kan. App. 2d 778, 788-89, 264 P.3d 1033 (2011), *petition for rev. filed* December 5, 2011; *State v. McCoy*, 34 Kan. App. 2d 185, 189-90, 116 P.3d 48 (citing cases), *rev. denied* 280 Kan. 988 (2005). In *Bailey*, 292 Kan. at 459, the court recently reiterated the doctrine specifically regarding jury instructions: "When defendant's requested instruction is given to the jury, the defendant cannot complain the requested instruction was error on appeal."

The invited error rule effectively binds trial counsel to strategic decisions inducing judicial rulings with the purpose of obtaining favorable judgments for their clients—not guilty verdicts or, in some cases, convictions on lesser charges for criminal defendants. See, *e.g., Angelo*, 287 Kan. at 279-80. The rule also defeats a disreputable strategy aimed at requesting that a judge act in a particular way to salt the record with error as an end in itself, thereby providing potential grounds for reversal of an adverse judgment. See *Schreiner*, 46 Kan. App. 2d at 791.

The Kansas Supreme Court has held that invited error will vitiate a criminal defendant's statutory right to receive jury instructions on lesser included offenses as provided in K.S.A. 22-3414(3). See, *e.g., Angelo*, 287 Kan. at 279-80. In that case, Angelo specifically asked that the district court instruct only on first-degree murder, although the evidence would have supported lesser included offenses; he intended to force on the jurors an all-or-nothing determination to convict or acquit. Defense counsel candidly divulged the reason at the instruction conference. The district court obliged Angelo. The jury did not. On appeal, Angelo argued that the lack of lesser included offense instructions violated K.S.A. 22-3414 and required the conviction be reversed. The Kansas Supreme Court turned away the argument because Angelo had invited the error. 287 Kan. at 279-80. Similarly, this court has held that a criminal defendant could not complain on appeal that his or her right to a unanimous verdict—also a statutory right—had been compromised because of a jury instruction he or she requested and the trial judge gave. See *Schreiner*, 46 Kan. App. 2d at 788-89.

Here, however, Hargrove asserts an error of constitutional dimension and, thus, of greater magnitude than the loss of a statutory right. The *Schreiner* decision acknowledged that difference and declined to consider how the invited error doctrine might be applied to an asserted constitutional violation. 46 Kan. App. 2d at 791. This case presents the question, and the time has come to provide an answer.

### 3. *Inviting Constitutional Error in Jury Instructions: A Study in Conflict*

Multiple considerations bear on how best to reconcile the invited error rule and the degradation of a criminal defendant's constitutional rights, especially when they arise from a defective jury instruction. Before turning to that assessment, we offer some accepted principles, common observations, and a survey of persuasive authority.

#### A. *General Principles*

Persons may relinquish their constitutional rights if they do so knowingly and voluntarily. Criminal defendants are no exception. *Maryland v. Shatzer*, 559 U.S. 98, 104, 130 S. Ct. 1213, 175 L. Ed. 2d 1045 (2010) (self-incrimination); *New York v. Hill*, 528 U.S. 110, 114-15, 120 S. Ct. 659, 145 L. Ed. 2d 560 (2000) (acknowledging criminal defendant may waive even fundamental rights); *Faretta v. California*, 422 U.S. 806, 807, 835, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975) (right to counsel). For example, an individual, having been advised in accordance with *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), may give up the right against self-incrimination and submit to a custodial police interrogation. *Shatzer*, 130 S. Ct. at 1219. And criminal defendants may forgo their constitutional right to counsel to represent themselves. *Faretta*, 422 U.S. at 807, 835. But they may not later complain about adverse consequences resulting from their own conduct in waiving those rights. *Faretta*, 422 U.S. at 834-35 & n.46 ("[W]hatever else may or may not be open to him on appeal, a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.' "); *Illinois v. Allen*, 397 U.S. 337, 342-43, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970) (criminal defendant may lose Sixth Amendment right to be present at trial by continuing disruptive conduct despite trial judge's warning that persistence will result in removal). That didn't happen here, since Hargrove did not personally request the deficient jury instruction. Those cases also really don't involve error—invited or otherwise—

because the district courts made no mistakes. They correctly followed the law by giving effect to valid, enforceable waivers.

Criminal defendants are generally bound by the actions of their lawyers, save for decisions on whether to go to trial, to testify, or to appeal. *Hill,* 528 U.S. at 114-15 (noting rights personal to a criminal defendant and identifying decisions exemplifying those a lawyer properly may make in the course of representation); see *Roe v. Flores-Ortega,* 528 U.S. 470, 477, 120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000) (If a criminal defendant requests a notice of appeal be filed, counsel's failure to comply must be treated as "professionally unreasonable."); *Faretta,* 422 U.S. at 820 ("[W]hen a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas."); *Flynn v. State,* 281 Kan. 1154, 1163, 136 P.3d 909 (2006); *State v. Carter,* 270 Kan. 426, 438-39, 14 P.3d 1138 (2000) ("[T]actical decisions" such as filing motions, selecting jurors, calling and examining witnesses are the sole province of the lawyer exercising "professional skill and judgment."); 270 Kan. at 439 (In consultation with counsel, a criminal defendant must personally decide whether to plead guilty or go to trial before a judge or jury and whether to testify in his or her own defense.). Selection and phrasing of proposed jury instructions come within those decisions entrusted to lawyers exercising their professional judgment. *United States v. Perez,* 116 F.3d 840, 845 n.7 (9th Cir. 1997); see *Tinsley v. Million,* 399 F.3d 796, 808 (6th Cir. 2005) (recognizing decision on requested jury instructions to be matter for lawyer as part of trial strategy); *Fitzgerald v. Thompson,* 943 F.2d 463, 469-70 (4th Cir. 1991) (same). Lawyers may compromise their clients' constitutional rights. See, *e.g., Taylor v. Illinois,* 484 U.S. 400, 409, 418, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988) (criminal defendant bound by his lawyer's actions adversely affecting Sixth Amendment right to compulsory process and to present witnesses); *Yakus v. United States,* 321 U.S. 414, 444, 64 S. Ct. 660, 88 L. Ed. 834 (1944) ("[A] constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right."); *United States v. Holmes,* 620 F.3d 836, 843 (8th Cir. 2010) (counsel may waive defendant's Sixth

Amendment confrontation rights for "valid, tactical purposes"). Here, trial counsel impaired Hargrove's Sixth Amendment right to have a jury decide all of the elements of attempted aggravated burglary by tendering the instruction and then by failing to object when the district court actually gave that instruction. We must decide whether the lawyer's conduct forecloses relief for Hargrove on direct appeal.

Because the error arose from a jury instruction, the answer is less straightforward than it otherwise might be. Most decisions a lawyer makes in trying a case are unilateral. That is, they are made without input from opposing counsel or the trial judge. The lawyer determines, for example, the witnesses to call, the questions to ask, and whether to interpose objections to what his or her counterpart does. While the trial judge must rule on objections, his or her function does not include consulting with counsel for either side about the choice of evidence to present or objections to lodge.

Jury instructions, however, don't come about that way in a given case. The process is collaborative rather than unilateral, and the trial judge ultimately controls the decision on how to instruct a jury. Each side may suggest instructions to the trial judge, as happened here. But a trial judge is not bound to give either side's suggested instructions and has an independent duty to fashion a set of instructions that correctly informs the jurors of the relevant law. As with much else in the adversary process, if the parties agree on a point, a trial judge commonly hasn't much cause or inclination to disregard their common position. See *Perez*, 116 F.3d at 844. So it was on the elements instruction in this case. Both the prosecutor and Hargrove's lawyer submitted proposed instructions that omitted the elements of theft from what the jurors had to find the State proved to convict. The trial judge accepted their communal position and gave that constitutionally infirm instruction.

Blame for the foul-up could be apportioned in various ways. Our conclusion that the elements instruction as proposed and given was erroneous breaks no new ground. Long before Hargrove's trial, the Kansas Supreme Court settled how juries should be instructed on the elements of burglary related offenses. See *Linn*, 251 Kan. at 802. The State, therefore, arguably bears some responsibility be-

cause its representative both proposed and acquiesced in the use of a recognizably defective instruction. See *United States v. Barrow*, 118 F.3d 482, 491 (6th Cir. 1997) (government bears some responsibility for defective elements instruction submitted jointly with defendant). Given the paramount duty imposed on prosecutors to see that the adjudicatory process serves the ends of justice even above securing convictions, the State ought not promote instructions that impair a defendant's fundamental rights. See *State v. Pabst*, 268 Kan. 501, Syl. ¶ 6, 996 P.2d 321 (2000). In short, the State should have done better here. Defense counsel also asked for the defective instruction and must be accountable in some significant fashion for the request. The request may have been tactical or simply inadvertent. We don't know. And, as we discuss later, the reason looms large in analyzing how the erroneous instruction should be treated. The district court exercises final authority over instructing a jury and the content of the instructions. See K.S.A. 22-3414(3) (The district court "shall instruct the jury" and, in doing so, may refuse to give requested instructions or may give them in a modified form.); *e.g., State v. Dozier*, 163 W. Va. 192, 196, 255 S.E.2d 552 (1979) ("The ultimate responsibility in criminal cases to ensure the jury is instructed according to constitutional requirements must be placed on the trial court."). So a district court could head off use of a bad instruction. Finally, unless this is a most unusual case, we may infer Hargrove played no role in fashioning the jury instructions and, therefore, would be personally blameless for the error. Nothing at the instruction conference even hints otherwise. Compare *Angelo*, 287 Kan. at 287 (At the instruction conference, the district court secured defendant's personal consent to his lawyer's request that no lesser included offenses be submitted to the jury in a first-degree murder prosecution.).

The Kansas Code of Criminal Procedure addresses instruction of the jury in considerable detail in K.S.A. 22-3414(3), governing the order of a trial. The statute provides that a party may not assert error in a jury instruction without having precisely objected to the instruction before it is given, unless the instruction is clearly erroneous. The statute does not explicitly account for a party requesting an instruction and then complaining on appeal because it

was given to the jury. Arguably, those circumstances come within the rule for clearly erroneous instructions to which no objection has been lodged, since defendants typically would not object to instructions they had earlier requested. But the Kansas appellate courts have consistently applied the invited error doctrine to bar *any* review of an instruction a party has successfully asked the trial judge give. See, *e.g.*, *Angelo*, 287 Kan. at 279-80; *Schreiner*, 46 Kan. App. 2d at 788-89.

## B. *Considering the Caselaw*

Having outlined those principles, we return to the question of how to assess the invited error of Hargrove's counsel in soliciting a constitutionally defective elements instruction. One approach would unconditionally bind Hargrove by the actions of his lawyer despite the constitutional dimension of the resulting error and his own lack of responsibility. The counterpoint would wholly untether him from the error precisely because of those considerations. Neither extreme provides a satisfactory response. The parties have supplied no controlling caselaw from either the United States Supreme Court or the Kansas Supreme Court, and we have uncovered none. We discuss some Kansas appellate decisions that consider peripheral points but ultimately do not lend themselves to resolving this issue. A representative sampling of persuasive authority from elsewhere provides some direction, though far from unanimous guidance.

### i. *Kansas law*

In *State v. Folley*, No. 89,368, 2004 WL 1714918, at *1 (Kan. App. 2004) (unpublished opinion), a panel of this court stated in dicta that "invited error cannot trump a defendant's constitutional rights," including a due process requirement that the jury find guilt beyond a reasonable doubt on each element of a charged offense. The court, however, acknowledged the case before it did not present an invited error issue and declined to elaborate on its terse observation or cite any directly applicable authority. The decision mentions *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970), a case that recognized a defendant's right to

have the State prove the elements of an offense beyond a reasonable doubt but does not concern invited error at all. The decision also cites *State v. Gadelkarim*, 256 Kan. 671, 685, 887 P.2d 88 (1994), in which the court declined to apply the invited error rule to a defendant's claimed *Doyle* violation. See *Doyle v. Ohio*, 426 U.S. 610, 617-19, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976) (prosecutor violates defendant's right to due process by eliciting evidence defendant chose to remain silent after law enforcement officers had provided *Miranda* warnings); *State v. Parks*, 294 Kan. 785, 793-94, 280 P.3d 766 (2012) (outlining nature of a *Doyle* violation). But the *Gadelkarim* decision lends no support to the assertion in *Folley*.

In response to a question from Gadelkarim's lawyer, a law enforcement officer testified that Gadelkarim asserted his right to remain silent after receiving the *Miranda* warnings. Without explaining why it sidestepped invited error, the *Gadelkarim* court simply determined on the merits that the testimony amounted to harmless error. 256 Kan. at 685-86. During a hearing on Gadelkarim's motion for a mistrial, the State argued defense counsel knew or should have known the question would elicit the impermissible testimony based on the officer's report. But defense counsel pointed to other portions of the report to suggest he was surprised by the officer's answer. Perhaps given that wrangling and in the absence of a fully developed evidentiary record on defense counsel's thinking, the court pragmatically passed over invited error to reach the merits of the point. But nothing in *Gadelkarim* suggests the invited error rule customarily ought to be disregarded in the face of a constitutional defect in a criminal proceeding. As an unpublished opinion, *Folley* is not precedential, and its collateral, undeveloped comment is not persuasive. Neither *Winship* nor *Gadelkarim* speaks to the issue at hand.

In *State v. Murray*, 285 Kan. 503, 521-28, 174 P.3d 407 (2008), the court in fact recognized that invited error principles had been and could be applied "in a very narrow context" of *Doyle* violations when the defense attorney effectively has opened the door. In that case, Murray's lawyer asked investigating officers if they had questioned Murray about circumstances they considered potentially in-

criminating. The officers responded they had not, thereby fostering the defense theory that investigators failed to fairly look at alternative explanations for those circumstances. But the officers didn't ask Murray because they couldn't—he had invoked his right against self-incrimination and declined to speak with them. The court found the trial judge properly allowed the prosecutor to briefly examine the lead detective about why those questions weren't put to Murray during the investigation. The examination necessarily revealed Murray's assertion of his constitutional right not to answer the questions. The court affirmed the ruling "in light of the specific facts" because defense counsel's questioning of the lead detective "provided a sufficient justification" for the prosecutor to ask the detective to explain the reason. 285 Kan. at 526. The court found: "[T]he detective's testimony on redirect examination merely responded to defense counsel's implications during cross-examination and thus was invited error and cannot be the basis for reversal." 285 Kan. at 526. A broadly phrased rule drawn from *Murray* could be stated recognizing that a violation of a defendant's constitutional rights should be excused as invited error. But teasing out that sort of proposition would exceed any judicious reading of the decision.

The *Murray* opinion is almost certainly confined to *Doyle* violations and could not fairly be extended to other constitutional rights. Nothing in the opinion suggests the court intended a broader application, and a good deal of the language points to the very opposite. In that case, as the court described the trial proceedings, Murray's lawyer deceptively portrayed material facts, raising *Doyle* as an invisible shield against the prosecutor in an effort to keep out otherwise relevant information that would have fully informed the jury. In effect, the court held that *Doyle* could not be used to mislead jurors, so the prosecutor's examination was proper. Looked at that way, there simply was no error. Many other courts have expressly recognized a limited fair-reply exception to *Doyle*. See *Cook v. Schriro*, 538 F.3d 1000, 1022 (9th Cir. 2008) ("We have interpreted *Doyle* to allow prosecutors to comment on post-*Miranda* silence in response to defense arguments."); *United States v. Martinez-Larraga*, 517 F.3d 258, 268 (5th Cir. 2008) (not-

ing continued recognition of fair-reply exception); *United States v. Matthews*, 20 F.3d 538, 552 (2d Cir. 1994) ("[W]hile comment on a defendant's silence is usually improper, such comment may be permissible when the defendant, by the impression he has sought to create, has opened the door."); *United States v. Shue*, 766 F.2d 1122, 1129 (7th Cir. 1985) (The rule of *Doyle* may yield because "[a] defendant should not be permitted to twist his *Miranda* protection to shield lies or false impressions from government attack."). The exception allows a surgical rebuttal confined to countering a cultivated and deceptive depiction of the evidence rather than a wide open use of the defendant's silence to prove guilt— the vice *Doyle* intended to eliminate. See *Murray*, 285 Kan. at 526 (prosecutor engaged in "limited questioning" of the detective about Murray's decision to remain silent and did not mention it in closing argument); *State v. Higgins*, 243 Kan. 48, 49-52, 755 P.2d 12 (1988) (reversible error for prosecutor to dwell on defendant's exercise of right to remain silent in questioning witnesses and in closing argument even though issue first arose in response to question posed by defense counsel on cross-examination).

The door-opening scenario of *Murray* does not come into play with jury instructions. A defendant's proposed jury instruction opens no door in front of the jury thereby "inviting" or necessitating some response from the prosecutor to rebalance an impermissibly shaded evidentiary presentation that may also tread upon constitutional protections. The lawyers propose, object to, and sort out jury instructions with the trial judge, so the jury only becomes aware of instructions after they have been fully vetted through that process. The error invited is that of the trial judge in giving a defective instruction at the defendant's behest—something that does not directly implicate or flow from the prosecutor's actions at all. Accordingly, *Murray* offers no directly applicable rule either supporting or rejecting use of the invited error doctrine to discard constitutionally based claims rooted in deficient jury instructions.

### ii. *Law in other jurisdictions*

Other courts have struggled with this issue over the years with disarmingly varied results. And more than a few courts have split

in addressing the circumstances of a single case. The authority we discuss offers an illustrative sampling reflecting both the array of responses reconciling invited error and constitutional right and the intractability of the issue.

For example, the Colorado Supreme Court concluded that invited error precluded appellate review of a jury instruction defense counsel requested and the trial court used that seemed to allow the jurors to convict even though the prosecution failed to prove identity beyond a reasonable doubt. *People v. Zapata*, 779 P.2d 1307, 1308-09 (Colo. 1989). The court held: "The allegation of constitutional error in the jury instruction does not require us to abandon the strict preclusion of review of invited error." 779 P.2d at 1309. But two concurring justices rejected an unyielding application of invited error in the face of a constitutional defect. See 779 P.2d at 1310 (Quinn, C.J., concurring) ("I would not apply the rule in such a manner as to preclude meaningful appellate review of invited errors that raise a substantial question as to the underlying fairness and integrity of the factfinding process."); 779 P.2d at 1312 (Lohr, J., concurring) ("The circumstances . . . are so many and varied, and the potential consequences . . . are so severe, that we would be best advised to address the issue of whether invited error requires reversal on a case by case basis."). Neither concurring opinion discussed how to treat a defective instruction sought as part of a defense strategy.

A unanimous Connecticut Supreme Court more recently took the same position as the *Zapata* majority. See *State v. Madigosky*, 291 Conn. 28, 35 n.7, 966 A.2d 730 (2009). And other appellate courts apply the invited error doctrine to bar review of even constitutionally defective jury instructions defense lawyers have requested. See *State v. Perdue*, 813 P.2d 1201, 1206 (Utah App. 1991) ("Here, we do not reach an evaluation of the correctness of the submitted instruction because if there was error, it was invited by the defendant, and where invited error butts up against manifest injustice, the invited error rule prevails."); *State v. Henderson*, 114 Wash. 2d 867, 868-70, 792 P.2d 514 (1990). In a decision that did not involve jury instructions, the United States Court of Appeals for the Seventh Circuit held last year that defense counsel invited

an arguably erroneous ruling from the trial judge, thereby preventing review of a claimed Sixth Amendment violation on direct appeal. The court framed its holding as categorical and, thus, without exception despite the constitutional character of the right. *United States v. Gaya*, 647 F.3d 634, 639-40 (7th Cir. 2011).

The majority opinion from a deeply divided Washington Supreme Court in *Henderson* typifies those that implacably apply the invited error doctrine, even to constitutionally defective jury instructions. Henderson's lawyer requested the bad instruction, and the error replicated exactly the one presented here. In a prosecution for attempted burglary, the trial court, contrary to then-existing requirements of Washington law, failed to inform the jury of the elements of the offense Henderson intended to commit had he successfully broken into a home. The factual identity of the error really gives the decision no more persuasive heft than cases involving other constitutionally infirm instructions. Nothing about a burglary offense makes the omission of some of its elements from a jury instruction any more or less pernicious.[1]

[1] Washington no longer requires that sort of instruction in burglary cases. See *State v. Bergeron*, 105 Wash. 2d 1, 4, 711 P.2d 1000 (1985). In *State v. Johnson*, 100 Wash. 2d 607, 625, 674 P.2d 145 (1983), the Washington Supreme Court ruled that jury instructions had to specify the elements of the intended offense making an unlawful entry a burglary and made them part of the prosecution's required proof to convict. The ruling bears similarities to Kansas law. See *State v. Rush*, 255 Kan. 672, Syl. ¶ 5, 877 P.2d 386 (1994). But the Washington Supreme Court overruled that position in *Bergeron*, 105 Wash. 2d at 4, given the broad definition of second-degree burglary requiring that the perpetrator intend to commit *any* crime against a person or property upon entering the premises. See Wash. Rev. Code § 9A.52.030 (2009). Henderson committed his offense during the 2-year window between *Johnson* and *Bergeron*, and, therefore, everyone agreed he was entitled to the benefit of *Johnson*.

The *Henderson* majority, in a 5-4 decision, recognized the instruction compromised a criminal defendant's constitutional right to have the jury decide every element of the charged offense. *Henderson*, 114 Wash. 2d at 870-71. But the court held the long-standing invited error doctrine precluded review because Henderson's lawyer proposed the instruction: "[E]ven if error was committed, of whatever kind, it was at the defendant's invitation and he is

therefore precluded from claiming on appeal that it is reversible error." 114 Wash. 2d at 870. Otherwise, the majority reasoned, the court would reward defendants for misleading trial judges. 114 Wash. 2d at 868.

The dissenters in *Henderson* acknowledged that the invited error doctrine had the primary purpose of discouraging " 'a party from *setting up* an error at trial and then complaining of it on appeal' [because] 'the adversary system cannot countenance such maneuvers.' " 114 Wash. 2d at 873 (Utter, J., dissenting) (quoting *State v. Pam*, 101 Wash. 2d 507, 511, 680 P.2d 762 [1984]). But they would not have applied the doctrine as an impregnable barrier, thereby allowing "more flexibility when the error is unintentional." 114 Wash. 2d at 873. The bar of invited error "should . . . give way when constitutional rights are involved and the flawed instruction was not proposed to deliberately create error." 114 Wash. 2d at 876. The dissenters assumed, without explanation, that defense counsel proposed the defective instruction through inadvertence and, therefore, would have reversed Henderson's conviction. See 114 Wash. 2d at 878-79.

Other courts align with the *Henderson* dissenters to permit review of invited errors to correct "manifest injustice," unless they result from a waiver—"the intentional relinquishment of a known right." *United States v. Rodriguez*, 602 F.3d 346, 350-51 (5th Cir. 2010); see *Barrow*, 118 F.3d at 491 (court recognizes exception to invited error rule "when the interests of justice demand otherwise" and applies exception to review defective jury instruction jointly submitted by prosecution and defense); *Zapata*, 779 P.2d at 1310 (Quinn, C.J., concurring) (The invited error doctrine should be discounted to reach trial defects, including instructions, going to "the underlying fairness and integrity" of the proceedings.); *Dozier*, 163 W. Va. at 196. Waiver renders an asserted error unreviewable. See *United States v. Olano*, 507 U.S. 725, 733, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993) (considering waiver and forfeiture under Federal Rule of Criminal Procedure 52); *United States v. Laurienti*, 611 F.3d 530, 543 (9th Cir. 2010) (If a defendant invites an error and, in doing so, relinquishes a known right, the error has been waived and becomes unreviewable.); *Rodriguez*, 602 F.3d at

350-51; *Perez*, 116 F.3d at 845. The Ninth Circuit Court of Appeals declined to find invited error or waiver based on defense counsel's endorsement of the trial court's defective elements instruction as a " 'complete and accurate' " statement of what the government had to prove because the trial record "clearly indicate[d]" both the judge and the lawyer misunderstood the applicable law. *United States v. Alferahin*, 433 F.3d 1148, 1154 n.2 (9th Cir. 2006).

The West Virginia Supreme Court, in a prototypical decision, declined to apply invited error when defense counsel offered and the trial judge used an instruction containing an unconstitutional presumption as to the elements of murder—contrary to a controlling decision handed down a year before the trial. *Dozier*, 163 W. Va. at 194-97. The court held that barring review on that basis "would be a travesty of justice" given the "fundamental constitutional right" compromised in the requested instruction. 163 W. Va. at 196. The court found it "extremely unlikely" that the defendant understood a constitutionally defective instruction had been tendered on her behalf or that she had made any informed waiver of her rights. 163 W. Va. at 196. The court similarly concluded defense counsel had entertained no "deliberate trial strategy or tactic" in requesting the instruction. Rather, the instruction reflected "an unfortunate mistake." 163 W. Va. at 197. The court, however, suggested, ever so gently, that the decision might have been different if "defense counsel deliberately created error at trial to get a reversal in the event of a conviction." 163 W. Va. at 197.

In two cases, the United States Court of Appeals for the Sixth Circuit entertained challenges to allegedly erroneous jury instructions defining the charged crimes when the prosecution and defense counsel jointly submitted the instructions. *United States v. Savoires*, 430 F.3d 376, 381 (6th Cir. 2005); *Barrow*, 118 F.3d at 491. The courts excused rigorous application of the invited error doctrine because the government bore essentially equal fault for the defective instructions. *Savoires*, 430 F.3d at 381; *Barrow*, 118 F.3d at 491. In neither case did the court consider whether the defendant's lawyer knew of the defect or consented to the bad instruction for tactical reasons. Nor did the decisions draw any legal distinction between invited error and waiver, as have some courts.

In *Savoires*, the panel found the instruction substantially misstated what the jury had to find to convict of a federal firearms offense, largely conflating two separate offenses and, thus, disadvantaging the defendant. The panel concluded that "the interests of justice" required review of the error and reversal of the conviction. *Savoires*, 430 F.3d at 381. In *Barrow*, an earlier panel similarly concluded invited error would not bar review of a jointly submitted, defective elements instruction. *Barrow*, 118 F.3d at 491. But anticipating the United States Supreme Court's position in *Neder v. United States*, 527 U.S. 1, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999), the panel found no negative effect on the defendant's rights because the omitted element was "not seriously contested at trial" and embraced an "obviously technical" aspect of the banking fraud charge. *Barrow*, 118 F.3d at 492-93. In each of those cases, the instructional error afforded the defendant no apparent tactical advantage and, more likely, aided the government to some extent.

The Illinois Supreme Court staked out a similar position in *People v. Bender*, 20 Ill. 2d 45, 54, 169 N.E.2d 328 (1960), relaxing the invited error bar to consider a constitutional defect in an instruction defense counsel requested because he, the prosecutor, and the trial judge proceeded on the mistaken understanding the instruction correctly described the burden of proof on insanity. In that circumstance, the court held the doctrine yields to a mistake making it "impossible for the defendant to receive a fair and impartial trial." 20 Ill. 2d at 54.

Much of the federal caselaw has been shaped around Federal Rule of Criminal Procedure 52(b), permitting correction of "plain error that affects substantial rights" even when it has not been called to the attention of the trial court, and the United States Supreme Court's interpretation of that rule in *Olano*, 507 U.S. at 731-37. Neither Rule 52(b) nor *Olano* specifically addresses invited error, but *Olano* recognizes that waiver of a right precludes appellate review of any claimed error. 507 U.S. at 733. In that respect, Rule 52(b) appears roughly comparable to K.S.A. 22-3414 with regard to jury instructions, and *Olano*'s treatment of waiver is similar to the Kansas appellate court's approach to invited error. At

the very least, the federal authority helps illuminate the multiple legal facets of the issue.

Various courts, however, only loosely define waiver and invited error. Some essentially equate the terms and find either imposes a near absolute bar to appellate review. See *Gaya*, 647 F.3d at 640 (invited error "is an *a fortiori* case of waiver"); *United States v. Perez*, 116 F.3d 840, 845 (9th Cir. 1997). Others draw a distinction finding that waiver results from an intentional relinquishment of a *known* right. 116 F.3d at 845. An invited error may be a waiver if the lawyer or party asking the court to act in a certain way understands that the action will impair or extinguish a right. *United States v. Quinones*, 511 F.3d 289, 321 (2d Cir. 2007) ("true waiver applies" when defendant "actively solicited" and received jury instruction "to procure a perceived . . . benefit"). But the lawyer or party may ask without having that understanding. The error is still invited, although some appellate courts will treat it as something short of an impregnable waiver. See *United States v. Barrow*, 118 F.3d 482, 490-91 (6th Cir. 1997) (Invited error "is a branch of the doctrine of waiver" that may yield to "the interests of justice," as where both the government and the defense jointly requested a defective jury instruction.); *Perez*, 116 F.3d at 845. The Kansas appellate courts often have drawn no particular distinction between waiver and invited error and treat them both as precluding appellate review of claims based on statutory rights. See *State v. Dunlap*, 46 Kan. App. 2d 924, 934-35, 266 P.3d 1242 (2011), *petition for rev. filed* December 30, 2011; *State v. Romero*, No. 105,158, 2012 WL 2924537, at *3-4 (Kan. App. 2012) (unpublished opinion), *petition for rev. filed* August 13, 2012; *State v. Rivera*, No. 92,569, 2005 WL 3527001, at *3 (Kan. App. 2005) (unpublished opinion), *rev. denied* 281 Kan. 1381 (2006).

Judge Harold Leventhal, of the District of Columbia Circuit Court of Appeals, once described judicial consideration of legislative history as akin to " 'looking over a crowd and picking out your friends.' " Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term*, 68 Iowa L. Rev. 195, 214 (1983); see *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546, 568, 125 S. Ct. 2611, 162 L. Ed. 2d 502 (2005). The same

might be said about the persuasive authority balancing invited error with constitutional defects in jury instructions. There are cases supportive of about any outcome. Some opinions offer little more than rote. Others rest on more developed discussions, though occasionally neglecting to account for the purpose behind the invited error rule. So from them, we take what we need and leave the rest. See Robertson, "The Night They Drove Old Dixie Down," The Band (1969).

### 4. *Forging Reconciliation*

In reconciling invited error and resulting constitutional defects in jury instructions adversely affecting criminal defendants, we balance competing considerations bound up in fairness—individual fairness for the person standing as the accused and institutional fairness for the system as an adjudicatory process. See *Neder*, 527 U.S. at 18-19. If the lawyer representing a criminal defendant makes a calculated decision to sacrifice certain constitutionally protected interests of his or her client for tactical advantage in attaining an acquittal and in doing so induces the district court to act or rule in particular ways, then those actions or rulings generally cannot be asserted as points of error on direct appeal of a conviction. To hold otherwise would invite game-playing and manipulation incompatible with a fair adjudicatory process. See *Henderson*, 114 Wash. 2d at 868 (Less than strict application of the invited error rule to jury instructions "would put a premium on defendants misleading the court; this we decline to encourage."). At the same time, however, an invited error of constitutional import in a jury instruction should not be immune from review on direct appeal if defense counsel requested the instruction through inadvertence and without strategic designs. To hold otherwise would deprive an accused of individual fairness.

The adversary system embodied in this nation's courts operates on the assumption that justice may best be harnessed when the disputants test each other's legal theories and factual portrayals before detached observers—judges or jurors—charged with resolving those disputes. See *United States v. Cronic*, 466 U.S. 648, 655, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984) (" 'The very premise

of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free.' ") (quoting *Herring v. New York*, 422 U.S. 853, 862, 95 S. Ct. 2550, 45 L. Ed. 2d 593 [1975]); *GTE Sylvania, Inc. v. Consumers Union*, 445 U.S. 375, 382-83, 100 S. Ct. 1194, 63 L. Ed. 2d 467 (1980) ("The clash of adverse parties ' "sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions." ' "); *State v. Bellinger*, 47 Kan. App. 2d 776, 787, 278 P.3d 975 (2012) (Atcheson, J., dissenting) ("The judicial process treats an appearance on the witness stand, with the taking of an oath and the rigor of cross-examination, as perhaps the most discerning crucible for separating honesty and accuracy from mendacity and misstatement."), *petition for rev. filed* July 23, 2012. But the process is far from a free-for-all. There are distinct rules of engagement designed to promote orderliness and, more importantly, basic fairness. Procedural and evidentiary codes set forth many of those rules; others reflect judge-made requirements born of practical experience. Some—particularly those insuring fairness for the accused—derive from constitutional guarantees, notably in the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and their counterparts in the Kansas Constitution Bill of Rights.

For example, in criminal cases, the prosecution must disclose exculpatory information to a defendant in advance of trial because the process would otherwise be unfairly skewed. See *Giglio v. United States*, 405 U.S. 150, 153-54, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972); *Brady v. Maryland*, 373 U.S. 83, 87-88, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). A defendant must formally identify a limited number of defenses that particularly lend themselves to testing through further investigation. *E.g.*, K.S.A. 22-3218 (alibi); K.S.A. 22-3219 (mental disease or defect). The failure to abide by those obligations has consequences. For the State, convictions may be reversed; for defendants, defenses may be lost.

The doctrine of judicial estoppel similarly advances notions of fair play by precluding a party from inducing judicial action by taking one legal position and then taking a contrary position later

to achieve further advantage over the same adverse party. See *Estate of Belden v. Brown County*, 46 Kan. App. 2d 247, 262-63, 261 P.3d 943 (2011). The United States Supreme Court recognized that the doctrine " 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.' " *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8, 120 S. Ct. 2143, 147 L. Ed. 2d 164 [2000]). A court may apply judicial estoppel in its discretion as necessary to preserve " 'the essential integrity of the judicial process.' " *New Hampshire*, 532 U.S. at 750.

Those statutory rules and common-law doctrines advance a process designed to discourage unfair manipulation for tactical advantage and to minimize any effects when it happens. They tend to impose penalties or counterbalances to accomplish that objective. The fair-reply exception engrafted on to *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), and the parallel holding in *State v. Murray*, 285 Kan. 503, 526, 174 P.3d 407 (2008), similarly operate to preserve a fair adjudicatory process. They are all of a kind in that service. The invited error doctrine is part and parcel of those safeguards. And it has central attributes comparable to judicial estoppel. See *Key Pharmaceuticals v. Hercon Laboratories Corp.*, 161 F.3d 709, 715 & n.1 (Fed. Cir. 1998) (noting similarity in operation and purpose of invited error and judicial estoppel in "prohibit[ing] a party from asserting as 'error' a position that it had advocated at the trial"). Both are premised on one party trying to shift legal arguments on an issue during a case, and both seek to protect the fairness of the process by requiring an advocate to adhere to an argument that has caused the court to act in a particular way. Judicial estoppel simply imposes consistency of position on an advocate who has persuaded the court in conformity with that position. The invited error doctrine prevents a more destructive practice—a party claiming the trial court committed reversible error by acting in the very manner that the party advocated.

If Hargrove's lawyer made a tactical decision to request a jury instruction on attempted aggravated burglary that omitted the el-

ements of theft, then the invited error doctrine should be applied on direct appeal to bar a claim that the conviction be reversed based on that omission. Lawyers may deploy strategies compromising certain of their client's rights in pursuit of an ultimate advantage, but they cannot then bank any judicial action they request as a deposit against reversible error when that advantage fails to materialize. A contrary rule would permit manipulation of the adversary process in a way that inflicts a deep wound on the systemic fairness vital to that process. The danger is no less when the rights compromised for strategic purposes rise to a constitutional level.

In short, the system depends upon holding advocates to their strategic choices and representations. See *State v. Schreiner*, 46 Kan. App. 2d 778, 791, 264 P.3d 1033 (2011) (The criminal justice system ought to discourage at every opportunity unprofessional and destructive game-playing.), *petition for rev. filed* December 5, 2011; *State v. Kitchens*, 299 Conn. 447, 470, 10 A.3d 942 (2011) (In considering invited error based on a requested and defective jury instruction, the court, using the bracketed language, observed: " '[T]o allow [a] defendant to seek reversal [after] . . . his trial strategy has failed would amount to allowing him to ambush the state [and the trial court] with that claim on appeal.' "). Giving full play to the invited error rule in those circumstances comports with the settled principles that a criminal defense lawyer's strategic determinations bind his or her client and that the lawyer may relinquish the client's constitutional rights, including having a jury decide each element of a charged offense.

The record in this case is silent on why Hargrove's lawyer requested the defective elements instruction the district court wound up giving the jury. Nothing really points toward a tactical decision to leave out the theft elements over an inadvertent omission of them or the other way around. In some cases, the record plainly reveals a strategic call. See *State v. Angelo*, 287 Kan. 262, 279, 197 P.3d 337 (2008) (Defense counsel requested no lesser included offense instructions be given specifically to force the jurors into a choice between convicting the defendant of first-degree murder or acquitting him.); *Quinones*, 511 F.3d at 320-21. Here, however, the district court seemingly failed to recognize the error, something

not entirely surprising, since both the State and Hargrove requested virtually the same flawed instruction. At the instruction conference, the district court neither remarked on the instruction nor asked the lawyers if they intentionally left out the elements of theft. Had the district court realized the irregularity, such an inquiry likely would have helped clear up matters. If we were to assume the omission lacked a tactical basis, then Hargrove's lawyer would have had an opportunity to reconsider and tender a complete elements instruction. We presumably would not now be addressing this issue. Conversely, if Hargrove's lawyer considered the abbreviated instruction tactically superior, he would have said as much—at least giving us a plain statement on the record.[2]

[2] The district court would not have had to do any more than secure the lawyer's acknowledgement that he tendered the instruction to confer some advantage on Hargrove. And the district court probably would have intruded unduly into work-product and possibly attorney-client privileges to require the lawyer to divulge the particular strategic attributes he imputed to the instruction.

Although we fail to see any overt tactical advantage to Hargrove in the elements instruction his lawyer tendered and the district court gave, we cannot say the instruction must have been the product of inadvertence or inattention. There may be factors informing the choice that are obscure or wholly invisible in the appellate record. See *Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) ("There are countless ways to provide effective assistance in a given case."). By way of contrast, some instructional errors could not possibly reflect reasonable strategic choices. See, *e.g.*, *State v. Carson*, 1 Hawaii App. 214, 215-16, 617 P.2d 573 (1980). In *Carson*, the trial court gave an instruction defense counsel tendered stating that the defendant had to prove self-defense by a preponderance of the evidence when the State actually bore the burden of negating that evidence in proving the defendant guilty beyond a reasonable doubt. No sound strategy could warrant a defendant assuming a heavier burden of proof than required under the law in establishing a defense. This is not such a case. The elements instruction here contains no comparable error incontestably devoid of strategic worth. Because the instruction might have been part of Hargrove's defense strategy and the dis-

trict court honored Hargrove's request it be used, we find that the invited error doctrine precludes direct appellate review premised on the constitutional defect in the instruction. See *State v. Paul*, 285 Kan. 658, 670, 175 P.3d 840 (2008) (A criminal defendant has the obligation to designate a record sufficient to support a claim of reviewable error on appeal.).

In most cases, civil or criminal, the district court record contains little or no evidence about the advocates' thought processes shaping their respective legal arguments and factual presentations. In turn, appellate courts typically cannot and do not entertain issues on direct appeal requiring an exploration of a criminal defense lawyer's tactical decisions or preparation of the case. See *Rowland v. State*, 289 Kan. 1076, 1083-84, 219 P.3d 1212 (2009) (Claims based on counsel's ineffectiveness and, thus, his or her trial strategies are seldom amenable to review on direct appeal because there has been "no chance to develop facts and present evidence in support of or in derogation of the quality of the trial representation."); *State v. Van Cleave*, 239 Kan. 117, Syl. ¶¶ 1, 2, 716 P.2d 580 (1986) (An appellate court typically will not hear an ineffective assistance claim on direct appeal, but counsel may seek remand to the district court for a hearing to develop the claim.). This appeal falls in that category. Hargrove's appellate counsel did not request remand to the district court for a hearing to develop that evidence. See *Rowland*, 289 Kan. at 1084 (appellate counsel may ask for remand to hold *Van Cleave* hearing).

Some courts treat a silent record—one failing to disclose that the faulty jury instruction resulted from a tactical decision of counsel—as insufficient to interpose a waiver or invited error on the assumption that the mistake may as likely have been inadvertent. See *Perez*, 116 F.3d at 842, 844-46. Those courts reason that the record does not affirmatively demonstrate that the defense lawyer knowingly invited the diminution of his or her client's rights. See 116 F.3d at 844-47. And they then apply a clear or plain error standard of review, commonly used when a lawyer simply fails to object to an instruction the trial court has proposed. See 116 F.3d at 842, 846-47. Their approach seems flawed in several respects. First, it imputes meaning to a silent record that cannot be inferred

and should not be presumed on any logical basis. Second, it rewards a lawyer for deliberate but stealthy manipulation of the process. If the lawyer can get by without having to acknowledge that he or she has proposed an otherwise defective instruction for strategic advantage, he or she both achieves that advantage, having induced the trial court to use the erroneous instruction, and avoids being bound by the strategy after it has failed. So a rule treating a silent record that way ultimately discourages candor between counsel and the trial court in fashioning jury instructions.

The more pragmatic approach we adopt would defer review of the flawed instruction until the ambiguity of a silent record has been resolved through an appropriate evidentiary hearing. The review would then be based on facts rather than artificial presumptions. In the absence of a developed record, we have declined to take up the merits of Hargrove's challenge to the elements instruction on this appeal.

If the record here had established that the defect in the elements instruction were the product of inadvertence or negligence, we recognize a compelling argument could be made for reaching the merits on direct appeal notwithstanding invited error principles. Were our view otherwise, much of the discussion to this point would have been superfluous. A simple, unqualified application of invited error would have sufficed to affirm. But invited error is a judge-made doctrine aimed at curtailing manipulative tactics inducing trial courts to make mistakes that otherwise might require reversal of an adverse verdict. As a judicially created rule, it should be tailored as necessary to serve its particular purpose without unnecessarily thwarting the ends of justice.

Those dual goals are best served in applying invited error to bar review of defective instructions requested for strategic objectives, thereby removing incentives for conduct deliberately destructive of the systemic fairness of the adjudicatory process. The need to maintain the integrity of the process supersedes calculated strategies that gamble for tactical advantage rights securing individual fairness. That sort of gamble amounts to a true waiver. We decline to presume the absence of a tactical motive or purpose from an ambiguous record.

But when the record shows that an instructional defect results from a defense lawyer's negligence or inadvertence and compromises a constitutional right, the reason for invoking the invited error rule has considerably less force. Lawyers have no incentive to act negligently or inadvertently in ways that impair their clients' constitutional protections. Those actions fall short of a waiver, since carelessness does not amount to a knowing relinquishment. Applying the invited error rule to them has only limited deterrent value, although lawyers might be prompted to craft jury instructions with more care. The defendant, however, loses direct appellate review of unintended errors impairing his or her fundamental rights. And extending the rule to negligent or inadvertent mistakes makes the rule no more effective in preventing deliberate injection of error for tactical advantage, its principal purpose. The outcome, at best, only marginally advances systemic fairness and does so by exacting a heavy price in individual fairness.

Even if the invited error rule might be appropriately applied to common trial decisions that unintentionally compromise a given defendant's constitutional rights, it ought to be relaxed for those deficiencies in jury instructions. Absent tactical intent on counsel's part, the shared responsibility for preparing final jury instructions weighs against rigid application of invited error to deflect a constitutional challenge. In any particular case, the circumstance still might call for applying invited error to bar review of a defective instruction. The myriad rights at stake and the fact-specific determination of the reasons for and harm caused by the error defy formulaic assessment through generic criteria or some preset multifactor test.

We do not consider the intersection of invited error and structural error. It represents quite another place on the judicial map. Although the same general policies and considerations likely inform·that issue, they might well be balanced differently for some or all structural errors. Among constitutional defects, structural errors stand apart because, by definition, they undermine the integrity of the adjudicatory process and, therefore, cannot be excused even if a defendant may be unable to demonstrate actual harm. See *Neder*, 527 U.S. at 8-9 (Structural errors "infect the entire trial

process" and "deprive defendants of 'basic protections' " essential to the reliable functioning of the criminal justice process; as such, they "defy harmless-error review.") (quoting *Rose v. Clark*, 478 U.S. 570, 577-78, 106 S. Ct. 3101, 92 L. Ed. 2d 460 [1986]). Invited structural errors exist, see *State v. Banks*, No. 105,953, 2012 WL 6061553, at *3-5 (Kan. App. 2012) (unpublished opinion), but they are rare birds. The constitutional error in this case is not structural, rendering our analysis plainly distinguishable on that basis. See 2012 WL 6061553, at *3-5 (panel declines to apply invited error rule and reviews defective reasonable doubt instruction that effectively permits State to convict by proving one element of the charged offense rather than all of them, thereby creating structural error).

By the same token, what we have decided today does not change the ironclad application of the invited error rule to preclude direct appellate review of points premised on statutory rights. Because those rights lack the fundamental qualities of constitutional protections, they may be irretrievably lost on direct appeal to invited error. As we have said, that is settled law. See *Angelo*, 287 Kan. at 279-80; *Schreiner*, 46 Kan. App. 2d at 789-91. The loss, whether prompted by tactics or inadvertence, sufficiently promotes systemic fairness and some measure of lawyer diligence so as to outweigh the diminution of statutory protections.

## 5. *Hargrove Retains Postconviction Remedies*

Although we have rejected Hargrove's asserted instructional error because the present record fails to show that his lawyer lacked a tactical objective, Hargrove has a way to raise the issue. After concluding his direct appeal, Hargrove may file a motion for habeas corpus relief, under K.S.A. 60-1507, based on any denial of his constitutional rights, including the effective assistance of trial or appellate counsel. In that proceeding, Hargrove would have the opportunity to develop a record regarding his trial lawyer's strategic decision, if any, regarding the elements instruction and other aspects of his district court representation. See *Kitchens*, 299 Conn. at 496-97 (noting availability of habeas corpus relief and likely superiority of that vehicle for determining if trial counsel's position

on a disputed jury instruction arose from "strategy" or "incompetence"); but see *People v. Zapata*, 779 P.2d 1307, 1311 & n.2 (Colo. 1989) (Quinn, C.J., concurring) (noting most invited errors are the product of inadvertence and suggesting habeas corpus relief, therefore, comes late for an incarcerated defendant denied review on direct appeal).

To obtain K.S.A. 60-1507 relief, Hargrove would have to show that trial counsel's performance, based on the totality of circumstances, "fell below an objective standard of reasonableness." *Bledsoe v. State*, 283 Kan. 81, 90, 150 P.3d 868 (2007). If so, Hargrove would then have to demonstrate prejudice resulting from the substandard representation to the extent that he would have had "a reasonable probability" of success at trial had he been adequately represented, meaning judicial "confidence in the outcome" has been "undermine[d]." See 283 Kan. at 90. The measure of the lawyer's representation outlined in *Bledsoe* mirrors the standard in *Strickland*, 466 U.S. at 687-88, 694. See *Chamberlain v. State*, 236 Kan. 650, Syl. ¶¶ 2-4, 694 P.2d 468 (1985) (adopting and stating *Strickland* test for ineffective assistance); see also *Holmes v. State*, 292 Kan. 271, 274-75, 252 P.3d 573 (2011) (noting standard and applying it to appellate representation on direct appeal). The Kansas Supreme Court recently reiterated the standard in *Edgar v. State*, 294 Kan. 828, 837-38, 283 P.3d 152 (2012).

As both the United States Supreme Court and the Kansas Supreme Court have noted, review of the representation should be deferential and hindsight criticism tempered lest the evaluation of a lawyer's performance be unduly colored by lack of success notwithstanding demonstrable competence. *Strickland*, 466 U.S. at 689-90; *Holmes*, 292 Kan. at 275. Rarely should counsel's representation be treated as substandard when he or she investigates the client's circumstances and then makes a deliberate strategic choice among multiple options. *Strickland*, 466 U.S. at 690-91. But that is not invariably so. A defendant may show that trial counsel's "representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986); see *Phoenix v. Matesanz*, 233 F.3d 77, 82 n.2 (1st

Cir. 2000) (decision of trial counsel not strategic within scope of *Strickland* if " 'the choice was so patently unreasonable that no competent counsel would have made it' "); *Hart v. Gomez*, 174 F.3d 1067, 1071 (9th Cir. 1999) (ineffectiveness portion of *Strickland* test satisfied where "no reasonable strategy . . . could account for defense counsel's failure to introduce this [readily available] corroborating evidence").

If Hargrove's counsel had no plausible strategy for requesting the defective instruction or he simply proposed the instruction without recognizing or considering the omission of the elements of theft, the ineffectiveness portion of *Strickland* typically would be satisfied. Hargrove then could obtain habeas corpus relief by showing the defect in the instruction undermined the trial process, costing him a reasonable probability of an acquittal. As the *Edgar* court explained, a defendant has demonstrated adequate prejudice if he or she has been "deprive[d] . . . of a fair trial." 294 Kan. at 837. The " ' "benchmark" ' " becomes " ' "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." ' " 294 Kan. at 837.

The particular test laid out in *Neder v. United States*, 527 U.S. 1, 17, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999), and *State v. Richardson*, 290 Kan. 176, 182-83, 224 P.3d 553 (2010), for prejudice to a criminal defendant when an element of the charged offense has been omitted from the jury instructions would provide an initial measurement. A showing of prejudice based on those criteria would not invariably establish that the trial process had sufficiently misfired to call into question the justness of the result. But when the omitted element has been contested and some evidence offered upon which a jury might find reasonable doubt, little more might be necessary on habeas review. The *Neder* decision at least suggests as much. See 527 U.S. at 19. The Court pointed out that calibrating the impact of an omitted element may be difficult when the defendant has offered evidence tending to negate it. 527 U.S. at 18. So the decision seems to say that a court reviewing the record could properly conclude "the purposes of the jury trial guarantee" had been scuttled "where the defendant contested the omitted

element and raised evidence sufficient to support a contrary finding"—that is, a reasonable doubt as to guilt. 527 U.S. at 19.

We do not mean to imply how a habeas corpus motion ought to be argued or resolved, especially in the absence of any evidentiary record on trial counsel's handling of the elements instruction. Our discussion merely points up Hargrove's avenue for review of the constitutional defect in the instruction, since the very existence of that route figures materially in affording the invited error doctrine primacy over tackling the issue on direct appeal.

SUFFICIENT EVIDENCE SUPPORTED JURY VERDICT

Hargrove contends the State presented insufficient evidence at trial to support his conviction for attempted aggravated burglary. We disagree and reject that contention.

In reviewing a sufficiency challenge in a criminal case, an appellate court construes the evidence in a light most favorable to the party prevailing below, here the State, and in support of the jury's verdict. The court will neither reweigh the evidence generally nor make credibility determinations specifically. *State v. Raskie*, 293 Kan. 906, 919-20, 269 P.3d 1268 (2012); *State v. Pham*, 281 Kan. 1227, 1252, 136 P.3d 919 (2006). The issue for review is simply whether rational jurors could have found the defendant guilty beyond a reasonable doubt. *State v. McCaslin*, 291 Kan. 697, 710, 245 P.3d 1030 (2011). Circumstantial evidence alone may yield a conviction if each element of the offense can be supported. *State v. Richardson*, 289 Kan. 118, 127, 209 P.3d 696 (2009).

As outlined in the jury instruction, the State had to prove that Hargrove undertook an overt act aimed at committing an aggravated burglary and did so with the particular intent to carry out the burglary but then failed to complete the offense. The instruction correctly informed the jury that overt acts exceed "mere preparation[s]" for a criminal offense and entail "step[s] in a direct movement toward" perpetrating the crime. See *State v. Martinez*, 290 Kan. 992, 1003, 236 P.3d 481 (2010). In turn, the instruction listed the elements of the completed offense of aggravated burglary applicable to Hargrove's prosecution: (1) knowingly entering or remaining in a residence; (2) without authority; (3) with the intent

to commit a theft; and (4) while a human being was in the building. As we have discussed, the instruction improperly omitted the elements of theft as the underlying crime the State alleged Hargrove intended to commit inside Geither's home. Those elements would have required the jury to find Hargrove intended to permanently deprive Geither of his property by "exerting unauthorized control" over that property. See K.S.A. 21-3701(a)(1). The value of any property Hargrove intended to take would have been immaterial, since either a felony theft or a misdemeanor theft supports an aggravated burglary charge.[3]

[3] The crime of aggravated burglary is not limited to residences and extends to other occupied structures or vehicles. See K.S.A. 21-3716. The underlying crime need not be a theft. Many other offenses, including any felony, will elevate an unlawful entry into a burglary or aggravated burglary. See K.S.A. 21-3715; K.S.A. 21-3716. And a defendant need not know that the building is occupied to commit an aggravated burglary. *State v. Watson*, 256 Kan. 396, 400-01, 885 P.2d 1226 (1994). The State would also have to prove the offense happened in Johnson County, Kansas, within the statute of limitations period. Venue and timeliness were undisputed.

Hargrove seizes on the split verdict the jury returned to contend evidence indicating he tampered with the telephone box or started prying open the back door cannot be considered in support of the attempted aggravated burglary because he was acquitted of the criminal damage to property charge. But the argument misconstrues the law. This court may consider evidence relevant to both charges in deciding whether the record supports the jury's guilty verdict on attempted aggravated burglary irrespective of the not guilty verdict on the criminal damage to property charge. See *State v. Beach*, 275 Kan. 603, 614-20, 622, 67 P.3d 121 (2003) (court reviews sufficiency of the evidence challenge to felony-murder conviction based on all of the record evidence even though jury acquitted defendant of predicate crime of aggravated robbery); *State v. Chaffee*, 36 Kan. App. 2d 132, 136-38, 137 P.3d 1070 (2006). The United States Supreme Court addressed the same issue in *United States v. Powell*, 469 U.S. 57, 67, 105 S. Ct. 471, 83 L. Ed. 2d 461 (1984), and came to the same conclusion. The Court largely relied on reasoning Justice Holmes set forth half a century

earlier in *Dunn v. United States*, 284 U.S. 390, 393, 52 S. Ct. 189, 76 L. Ed. 356 (1932). *Powell*, 469 U.S. at 62-65. Hargrove points to nothing suggesting the law has taken some turn away from *Dunn* or *Powell* in the last 30 years. The *Beach* decision supports their continued vitality. 275 Kan. at 617-20.

In *Powell*, a unanimous Supreme Court acknowledged that a jury's not guilty verdict on one charge may appear inconsistent with its guilty verdict on another charge against the same defendant. But a reviewing court typically should not try to look behind the verdicts to discern a particular motive, purpose, or meaning in the jury's actions. See 469 U.S. at 64-65. The jurors might have been confused about how to perform their duty, resulting in seemingly discordant verdicts. Or they may have chosen to show lenity toward the defendant by returning a not guilty verdict on one or more charges despite the evidence and the instructions—exercising the absolute, if unsanctioned, power of nullification afforded juries in criminal cases. A court, however, cannot insightfully analyze the basis for the result and, therefore, ought not impute a particularized meaning to it. 469 U.S. at 65-67. Delving into a jury's verdicts to accurately discern what may have prompted them insinuates the court into processes that have typically and traditionally been treated as nearly sacrosanct. 469 U.S. at 67.

In turn, the *Powell* Court recognized that inconsistent verdicts should not influence the review of a defendant's challenge to the sufficiency of the evidence supporting the offense on which a jury brought back a guilty verdict. The Court stated: "Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt. [Citations omitted.] This review should be independent of the jury's determination that evidence on another count was insufficient." 469 U.S. at 67. The Kansas Supreme Court embraced the reasoning of *Powell* and drew heavily from that decision in *Beach*, 275 Kan. at 618-20.

Those cases necessarily guide our determination of what evidence we may consider in weighing Hargrove's sufficiency challenge. In those cases, the juries brought back not guilty verdicts on charges that entailed predicate conduct directly tied to the charges

on which they returned guilty verdicts. The not guilty verdicts were truly inconsistent with the guilty verdicts. But the inconsistency did not curtail the scope of evidence properly considered in deciding a defendant's claim that insufficient evidence supported his or her conviction.

If anything, that approach should be more readily applied to a case such as this because the criminal damage to property charge is not a legally necessary predicate for the attempted aggravated burglary charge. That is, the State may charge and convict of aggravated burglary without showing the defendant criminally damaged property as well. The two charges are linked only in the sense that the evidence used to prove the criminal damage charge—the tampering with the telephone box and the prying of the back door—also provided circumstantial evidence for the attempted aggravated burglary charge bearing on Hargrove's intent and purpose. This court may consider those circumstances in evaluating the sufficiency of the evidence on the burglary charge even though the jury found Hargrove not guilty of criminal damage. The not guilty verdict creates no legal or practical bar to considering the evidence to the extent it supports the attempted aggravated burglary.

The State, of course, could have chosen not to charge Hargrove with criminal damage, and there would have been no jury verdict at all on that offense. Under those circumstances, the evidence regarding the telephone box and the back door obviously could have been taken into account in assessing the sufficiency of the State's proof of the attempted aggravated burglary. As the *Powell* Court recognized, the interposition of a not guilty verdict doesn't alter those considerations. 469 U.S. at 67; see *Beach*, 275 Kan. at 619-20 (quoting *Powell*, 469 U.S. at 67).

Even if we indulged in an unwarranted assumption that the jury brought back a not guilty verdict because it was unconvinced beyond a reasonable doubt that Hargrove tampered with the telephone box and pried the back door—the premise of his argument on appeal—our approach would be no different. Jurors need not weigh each piece of evidence and find it true beyond a reasonable doubt to consider it along with the rest of the evidence. Rather,

the jurors may assess what weight or credit to give testimony or physical evidence. Jurors may accord great persuasiveness to consistent, corroborating testimony from a series of disinterested witnesses or to unrebutted DNA evidence showing a defendant to have been involved in a crime. By the same token, jurors may extend only limited value to the testimony of a purported accomplice cutting a deal with the State. But the jurors need not discount entirely the accomplice testimony because they are unconvinced it is correct beyond a reasonable doubt. Ultimately, jurors in a criminal case must be convinced the evidence collectively establishes beyond a reasonable doubt the elements the State is required to prove for the charged offense. Particular evidence might be afforded considerable credit in satisfying that standard, while other evidence could be viewed as less reliable but still indicative of guilt, and some could be rejected outright as unworthy of belief.

The not guilty verdict on the criminal damage to property charge cannot be treated as a rejection of the evidence as wholly unreliable or a conclusive determination that Hargrove did not do those acts. The verdict may have been the product of jury confusion or of jury lenity toward Hargrove, as *Powell* and *Beach* recognize. Maybe the jurors truly entertained a reasonable doubt that Hargrove ripped open the telephone box and tried to jimmy the back door. We don't know and can't speculate in the way Hargrove wants us to. But even if the jurors had a reasonable doubt Hargrove did those acts and found him not guilty for that reason, they still could consider that evidence as part of the collective body of evidence on the attempted aggravated burglary charge so long as they deemed it worthy of some credit. There is no legal inconsistency in affording that evidence some weight, along with the rest of the circumstances, in deciding to convict Hargrove of attempted aggravated burglary but finding it insufficient to prove beyond a reasonable doubt that he damaged the property.

Turning to the sufficiency of the evidence, the trial record, taken most favorably to the State as the prevailing party, supports the conviction for attempted aggravated burglary. Identity is not at issue in that Hargrove indisputably went to Geither's front door and admitted as much to the police, although he denied some of

the activity. Nor does Hargrove contest that Geither was in the house at the time. On appeal, Hargrove contends the evidence fails to show both an overt act taken in commission of burglary and an intent to commit a theft. As we have noted, Hargrove contends that the tampering with the telephone box and the prying of the back door cannot be considered for those purposes. But *Powell* and *Beach* reject that argument, since the not guilty verdict may have resulted from lenity or nullification. If we were to ignore the holdings in those cases and then to treat that verdict as establishing a reasonable doubt that Hargrove damaged the telephone box or the back door, we would have to reject those circumstances as overt acts. That's because an overt act is an element of an attempt— something the State specifically must prove beyond a reasonable doubt—and not merely evidence to be weighed in support of one or more elements of the crime. Ultimately, however, Hargrove comes up short whichever way we look at the evidence.

Tampering with the alarm system or jimmying of the back door would amount to distinct overt acts in the commission of a burglary. One is a direct step to avoid detection while carrying out the crime, and the other is a direct step in entering the premises to commit the crime. The divide between an overt act and mere preparation isn't always well marked; it often depends upon the facts of the case and the nature of the crime. *State v. Garner*, 237 Kan. 227, 238, 699 P.2d 468 (1985) ("no definitive rule as to what constitutes an overt act for purposes of attempt"; "[e]ach case must depend largely on its particular facts and the inferences which a jury may reasonably draw"). Here, a jury reasonably could conclude those actions exceeded mere preparation. See *State v. Chism*, 243 Kan. 484, 490, 759 P.2d 105 (1988) (jury could find defendant's entry into backyard overt act in commission of attempted burglary); *State v. Cory*, 211 Kan. 528, 531, 506 P.2d 1115 (1973) (attempted entrance sufficient to support attempted burglary).

Apart from that conduct, a jury could reasonably find Hargrove engaged in an overt act when he rang the doorbell about 10 times, went to his car, and returned to ring the bell again and to try the door handle. Those efforts could be logically and readily construed as a means to determine if the house were unoccupied, making it

a suitable target for a break-in and theft. And Hargrove might well have tried the front door to see if it were unlocked so he could avoid forcing his way in after disabling the alarm. Again, that activity goes well beyond mere preparation, such as placing the gloves, screwdriver, or other burglary tools in the car.

Hargrove attempts to defuse that evidence based on Geither's testimony that he "thought" he made eye contact with Hargrove when he looked out the upstairs front window. On appeal, Hargrove contends the conduct attributed to him in attempting to break into the house knowing it to be occupied would have been nonsensical. And, he says, the return to the front door would have been consistent with an effort to contact the occupant to get directions. But the argument requires this court to reweigh the evidence in a manner contrary to the verdict—something this court cannot do. See *Raskie*, 293 Kan. at 919-20. The jury certainly could have discounted Geither's surmise that he and Hargrove made eye contact. The jury also had reason to reject the explanation Hargrove offered the police about trying to get directions. He never asked the uniformed officers on the scene about directions, and he suggested he had been at the house only a couple of minutes when the actual time was considerably longer—enough of a variance that the jury could conclude the statement amounted to a prevarication and not just a mistake.

In short, a reasonable jury could find Hargrove took one or more overt acts toward the commission of a burglary.

Hargrove also argues the evidence fails to show he had an intent to commit a theft when he approached the house. Gauging intent is often an imprecise task. Jurors must determine what is going on inside a person's head, and criminals routinely disavow any bad purpose. Jurors are left to survey the circumstances to discern a defendant's actual intent. So it is in ferreting out whether someone has the requisite intent to commit a theft, thereby supporting a conviction for burglary, aggravated burglary, or, in this case, an attempt. See *State v. Harper*, 235 Kan. 825, Syl. ¶ 2, 685 P.2d 850 (1984); *State v. Wilson*, 45 Kan. App. 2d 282, 288, 246 P.3d 1008, *rev. denied* 292 Kan. 969 (2011). The jurors may consider "the totality of the surrounding circumstances," in a burglary prosecu-

tion, including "the manner of the entry, the time of day, the character and contents of the building, the person's actions after entry . . ., and the intruder's explanation, if he or she decides to give one." *Harper*, 235 Kan. 825, Syl. ¶ 2.

In *Harper*, the court found sufficient evidence to support an intent to commit a theft where the defendant broke into a school in the middle of the night, headed toward the secretary's office where valuable property was kept, attempted to enter that inner office, and then fled as police arrived. 235 Kan. at 832-33. After he was caught, the defendant offered a story that failed to reasonably explain his presence in the school or to dispel guilt.

The circumstances here are comparable, although Hargrove was thwarted before he actually entered the house. Hargrove was on a secluded residential street at midday, when most homes likely would be empty. His conduct in ringing the doorbell repeatedly for two extended periods squares with making sure the house was, in fact, unoccupied. The jury could consider the evidence that the alarm system had been tampered with and the back door jimmied—again, conduct consistent with an intent to enter the house without being detected. Hargrove's possession of a screwdriver and cotton gloves falls in line with housebreaking. Finally, as we have noted, Hargrove's explanation of his purpose had aspects that didn't square with his conduct and, thus, suggested a lack of candor.

From those circumstances, the jurors could have reasonably concluded Hargrove meant to enter Geither's home believing it to be empty and to do so for a nefarious purpose. Consistent with *Harper*, those jurors fairly could have inferred Hargrove intended to steal valuable (and portable) property from the house. Nothing suggested some other bad intent or purpose. For example, Hargrove did not have the tools of an arsonist—an accelerant and rags—or a vandal—spray paint and a sledgehammer. Reasoned inferences drawn from circumstantial evidence will support a jury verdict requiring proof of criminal intent, including commission of a theft. See *Harper*, 235 Kan. 825, Syl. ¶ 2 (The criminal intent necessary to support a burglary conviction "is rarely susceptible of direct proof; it is usually inferred from the surrounding facts and

circumstances.). Sufficient evidence supported the verdict convicting Hargrove of attempted aggravated burglary.

Affirmed.