CHAMBERLIN, JUSTICE, FOR THE COURT:
 

 ¶ 1. David Thomas admitted in oral and written statements to police that he and Jontez Garvis had attacked Fred Jackson and stolen cash from him. After being hospitalized for forty-one days due to the injuries inflicted by the two men, Jackson died. Thomas was indicted for and convicted of capital murder. The trial court sentenced Thomas to life in prison without parole. After review, we affirm Thomas's conviction and sentence.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. On January 29, 2012, Sean Snow, a deputy sheriff, responded to Tri-State Recycling, also known as The Can Man, located at 416 Woodrow Wilson Drive in the City of Jackson, First Judicial District of Hinds County, Mississippi, pursuant to a 911 call. The 911 caller reported that a man was lying unresponsive behind The Can Man. Deputy Snow found the man, who later was identified as Fred Jackson, lying on his back. According to Deputy Snow, Jackson's "[f]ace was kind of bluish gray," his face was bruised, and he had "dried up blood on the right-hand side of his head." Deputy Snow called American Medical Response ("AMR") and the fire department to the scene and they transported Jackson to University of Mississippi Medical Center ("UMMC"). Deputy Snow accompanied Jackson to UMMC where a physician informed him that Jackson had a "fifty/fifty chance."
 

 ¶ 3. Deputy Snow obtained and reviewed surveillance videotape footage from The Can Man. He testified that, on the surveillance videotape footage, he had observed two men entering The Can Man, moving to the rear of the property, and proceeding behind a parked truck. The two men "appeared to be striking Mr. Jackson" and
 continued doing so "somewhere around fourty [sic], forty-one, seconds."
 

 ¶ 4. Officer Felix Hodge of the Robbery Homicide Division of the Jackson Police Department received a tip that David Thomas was in a room at the Studio 6 Motel on Interstate-55 North. The record is silent as to how Thomas had become a suspect. According to Officer Hodge, the room was registered to a Tera Johnson and when an attempt was made to contact the occupant of the room, Thomas initially said his name was Jerrell Davis. After Thomas was taken into custody, Officer Hodge recited
 
 Miranda
 

 [1]
 
 warnings and obtained Thomas's written waiver.
 

 ¶ 5. Officer Hodge then interviewed Thomas. A video recording of the interview was played for the jury at Thomas's trial. Thomas said during the interview that he had gone to The Can Man to "get a battery to get cash" in order to finance a visit to Nightlife, a nightclub at which a rapper by the name of Future was to perform a show. In the jury's presence, Officer Hodge read the statement Thomas gave:
 

 Jontez [Garvis] came to my house that morning and got me. He asked me was I ready to go get those batteries? He said that he needed money for child support and pampers for his baby. We went through the pathway in the place. We were looking around but didn't find the batteries. I heard a noise, like, a welding machine or a generator. I asked [Garvis] did he hear that? And he said: No. I saw the truck. And I said: Man, there is somebody out here. He said: So, we can get him. We went up to the man and attacked him. I hit him once. [Garvis] hit him two or three times. We weren't planning on it to happen to him like that. I was scared from that morning on. [Garvis] called somebody to come pick us up. We went to the house. And I thought about it. We prayed that [Jackson] would make it through, and everything would be okay.
 

 Thomas also indicated in his written statement and in the interview that he and Garvis had taken $250 from Jackson and that they had hit him with the rod with which he had been welding.
 

 ¶ 6. After forty-one days at UMMC, Jackson died on March 9, 2012. On May 9, 2012, Thomas and Garvis were indicted jointly for capital murder. The State did not seek the death penalty and requested that the cases "be severed for purposes of jury trial." The Circuit Court of the First Judicial District of Hinds County granted the motion to sever Thomas's and Garvis's jury trials.
 

 ¶ 7. Dr. Erin Barnhart, who in 2012 was a deputy medical examiner with the Mississippi Medical Examiner's Office, testified that she performed the autopsy on Jackson on March 10, 2012. Dr. Barnhart testified that Jackson's head had suffered multiple fractures: "fractures of the calvarium, or top of the head; fractures at the base of the skull which is the inner aspect of the cranial cavity; and multiple fractures of his face." She continued: "[H]e had [ ] partially healed cerebral contusions or bruising of the brain" and "a subdural hematoma [,] which means blood within the cranial cavity between the brain and the surface of the skull." Dr. Barnhart testified, to a reasonable degree of scientific certainty, that the cause of Jackson's death was complications of blunt head trauma, and the manner of his death was homicide.
 

 ¶ 8. On cross-examination, Dr. Barnhart was asked about a notation in the autopsy report of "probable aspiration pneumonia." According to Dr. Barnhart, aspiration
 pneumonia"is generally caused when someone cannot protect their airway," meaning "that they have an altered level of consciousness and therefore may aspirate or breath in mucus, and hence bacteria that are in their mouth," therefore, "a pneumonia may develop." Dr. Barnhart testified that Jackson was to be discharged to a nursing home. She stated that the aspiration pneumonia may have contributed to Jackson's death, but that aspiration pneumonia could be ruled out as a cause of death.
 

 ¶ 9. The trial court denied Thomas's motion for a directed verdict. After consultation with the trial court and defense counsel about his right to testify in his defense, Thomas decided not to do so. The defense intended to call two witnesses, Dr. Steven Hayne and Jontez Garvis, for Thomas's case-in-chief.
 

 ¶ 10. Pretrial, the State had moved
 
 in limine
 
 to exclude the testimony of Dr. Hayne. After a
 
 Daubert
 

 [2]
 
 hearing, the trial court granted the State's motion and excluded Dr. Hayne's testimony. The defense moved for reconsideration
 
 ore tenus
 
 before its case-in-chief, and the trial court denied the motion. The defense then called Jontez Garvis to testify.
 

 ¶ 11. After the close of testimony and closing arguments, the jury retired to deliberate. It found Thomas guilty of capital murder. The trial court sentenced Thomas to life imprisonment without the possibility of parole. The trial court denied Thomas's motion for judgment notwithstanding the verdict.
 

 ¶ 12. Thomas now appeals. His counsel raises two issues. First, he argues that the State failed to adduce sufficient evidence to support the jury's verdict. Second, he argues that the trial court erred by excluding Thomas's proposed expert defense witness, Dr. Hayne. Thomas also has filed a supplemental brief,
 
 pro se
 
 , in which he raises the following issues:
 

 1. Whether the trial court erred by finding Thomas competent to stand trial.
 

 2. Whether the trial court erred by denying Thomas's motion to recuse the trial judge.
 

 3. Whether the trial court misapplied
 
 Batson v. Kentucky
 
 ,
 
 476 U.S. 79
 
 ,
 
 106 S.Ct. 1712
 
 ,
 
 90 L.Ed. 2d 69
 
 (1986).
 

 4. Whether the trial court erred by excluding Thomas's proposed expert defense witness, Dr. Steven Hayne.
 

 5. Whether the trial court erred by denying jury instructions requested by Thomas's counsel.
 

 6. Whether the trial court erred when it refused to instruct the jury on the elements of armed robbery.
 

 7. Whether cumulative error requires reversal.
 

 ¶ 13. We address each issue in turn. For clarity, we will address Thomas's pro-se claim concerning Dr. Hayne together with his counsel's claim. We also will combine our discussion of the errors that Thomas claims concerning the jury instructions. Additional facts and procedural history will be discussed as necessary for each issue.
 

 ANALYSIS
 

 I. Whether the State adduced sufficient evidence to support the jury's verdict.
 

 ¶ 14. Thomas's counsel first argues that "[t]he expert testimony from Dr. Barnhart shows that the State failed to
 prove beyond a reasonable doubt that any damage inflicted by the Defendant was the legal cause of death." Dr. Barnhart testified, to a reasonable degree of scientific certainty, that the cause of Jackson's death was complications of blunt head trauma, and the manner of his death was homicide. Dr. Barhnart testified that aspiration pneumonia"certainly may been contributory," but that aspiration pneumonia could be ruled out as a cause of Jackson's death.
 

 ¶ 15. This Court, in
 
 Shelton v. State
 
 ,
 
 214 So.3d 250
 
 , 256 (Miss. 2017), detailed our familiar standard of review for a challenge to the sufficiency of the evidence:
 

 This Court reviews a challenge to the sufficiency of the evidence under the standard detailed in
 
 Bush v. State
 
 ,
 
 895 So.2d 836
 
 , 843 (Miss. 2005) [
 
 abrogated on other grounds by
 

 Little v. State
 
 ,
 
 233 So.3d 288
 
 , 292 (Miss. 2017) ]. We recognize that "the critical inquiry" under the standard is whether the evidence supports a finding that the accused "committed the act charged ... under such circumstances that every element of the offense existed."
 

 Id.
 

 " '[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution,
 
 any
 
 rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' "
 

 Id.
 

 (quoting
 
 Jackson v. Virginia
 
 ,
 
 443 U.S. 307
 
 , 319,
 
 99 S.Ct. 2781
 
 ,
 
 61 L.Ed. 2d 560
 
 (1979) (emphasis in original) ). Further:
 

 if a review of the evidence reveals that it is of such quality and weight that, "having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense," the evidence will be deemed to have been sufficient.
 

 Id.
 

 ;
 
 see also
 

 Roby v. State
 
 ,
 
 183 So.3d 857
 
 , 869 (Miss. 2016).
 

 Shelton
 
 ,
 
 214 So.3d at 256
 
 .
 

 ¶ 16. "The killing of a human being without the authority of law by any means or in any manner shall be capital murder ... [w]hen done with or without any design to effect death, by any person engaged in the commission of the crime of ... robbery ...."
 
 Miss. Code Ann. § 97-3-19
 
 (2)(e) (Rev. 2014). Thomas admitted to police that he had gone to The Can Man location with Garvis and he admitted that he had attacked Jackson: "I hit him once. Jontez hit him two or three times." Thomas also confessed that he and Garvis had taken $250 from Jackson.
 

 ¶ 17. The defense took the position at trial that Thomas was at The Can Man and had participated in the robbery, but that the cause of Jackson's death was not the injuries sustained during the robbery, but rather aspiration pneumonia which was contracted during Jackson's hospital stay. On appeal, the defense maintains its argument that the testimony of Dr. Barnhart was insufficient to support the capital-murder conviction.
 

 ¶ 18. This Court considered a case in which the victim had been shot six times and died in the hospital "several days after his admission for treatment of his gunshot wounds...."
 
 Holliday v. State
 
 ,
 
 418 So.2d 69
 
 , 70-71 (Miss. 1982). The decedent's treating surgeon testified that "the cause of death was overwhelming infection secondary to his injuries."
 

 Id.
 

 at 71
 
 . Next, the surgeon agreed that the "cause of death was gunshot wounds."
 

 Id.
 

 In its analysis, the
 
 Holliday
 
 Court recognized:
 

 The unlawful act or omission of accused need not be the sole cause of death. The test of responsibility is whether the act of accused contributed to the death, and, if it did, he is not relieved of responsibility by the fact that other causes also
 contributed. Moreover, responsibility also attaches where the injury materially accelerates the death, although the death is proximately occasioned by a preexisting cause.
 

 Id.
 

 (quoting
 
 Schroer v. State
 
 ,
 
 250 Miss. 84
 
 , 91,
 
 160 So.2d 681
 
 (1964) ) (citation omitted). This Court held that "the jury was justified in determining the gunshot wounds were a substantial contributing cause of death."
 

 Id.
 

 ¶ 19. Here, the jury was justified in its finding, based on the testimony of Dr. Barnhart, that the cause of Jackson's death was complications of blunt-force trauma, irrespective of the fact that aspiration pneumonia was a possible contributing cause of death. This issue is without merit.
 

 II. Whether the trial court erred by excluding Thomas's proposed expert defense witness, Dr. Steven Hayne.
 

 ¶ 20. Thomas's counsel contends that the trial court's exclusion of Dr. Steven Hayne's proposed testimony deprived Thomas of presenting his sole theory of defense. In his pro-se brief, Thomas agrees, claiming that he was denied his fundamental right to present a meaningful defense.
 

 ¶ 21. This Court applies an abuse-of-discretion standard to the trial court's admission or exclusion of expert testimony.
 
 Gillett v. State
 
 ,
 
 56 So.3d 469
 
 , 494 (Miss. 2010) (citing
 
 Miss. Transp. Comm'n v. McLemore
 
 ,
 
 863 So.2d 31
 
 (Miss. 2003) ). Mississippi Rule of Evidence 702 provides that:
 

 A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
 

 (a)
 
 the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
 

 (b)
 
 the testimony is based on sufficient facts or data;
 

 (c)
 
 the testimony is the product of reliable principles and methods; and
 

 (d)
 
 the expert has reliably applied the principles and methods to the facts of the case.
 

 M.R.E. 702. This Court has held that:
 

 "[T]he opinion of an expert witness must be stated with reasonable certainty, given the state of knowledge in the field in which the expert is qualified."
 
 West v. State
 
 ,
 
 553 So.2d 8
 
 , 20 (Miss. 1989) (citations omitted). In other words, these opinions "must rise above mere speculation."
 
 Williams v. State
 
 ,
 
 35 So.3d 480
 
 , 486 (Miss. 2010) (quoting
 
 Goforth v. City of Ridgeland
 
 ,
 
 603 So.2d 323
 
 , 329 (Miss. 1992) ). "[I]ndefinite" expert opinions, or those "expressed in terms of mere possibilities," are not admissible.
 
 West
 
 ,
 
 553 So.2d at
 
 20 (citing
 
 Scott County Co-op v. Brown
 
 ,
 
 187 So.2d 321
 
 , 325-26 (Miss. 1966) ;
 
 Gen. Benevolent Assoc. v. Fowler
 
 ,
 
 210 Miss. 578
 
 , 589,
 
 50 So.2d 137
 
 , 142 (1951) ). For example, we have held that an expert's offering a "reasonable hypothesis" was insufficient, explaining that "[e]xpert testimony should be made of sterner stuff."
 
 Goforth
 
 ,
 
 603 So.2d at 329
 
 .
 

 Parvin v. State
 
 ,
 
 113 So.3d 1243
 
 , 1247 (Miss. 2013).
 

 ¶ 22. Thomas's counsel is correct to point out that " 'when a State brings it judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense.' "
 
 Isham v. State
 
 ,
 
 161 So.3d 1076
 
 , 1081 (Miss. 2015) (quoting
 
 Ake v. Oklahoma
 
 ,
 
 470 U.S. 68
 
 , 70,
 
 105 S.Ct. 1087
 
 ,
 
 84 L.Ed. 2d 53
 
 (1985) ).
 
 Ake
 
 "addressed an indigent defendant's
 right to expert witnesses, concluding that the right at stake implicated a defendant's access to justice:"
 

 Meaningful access to justice has been the consistent theme of these cases. We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense.
 

 Ake
 
 ,
 
 470 U.S. at 70
 
 ,
 
 105 S.Ct. 1087
 
 .
 

 ¶ 23.
 
 Ake
 
 and the other cases cited by Thomas's counsel, though, relate to the defendant's entitlement to an expert witness, which is not an issue here, as the trial court authorized expert funding to enable the defense to hire an independent pathologist. The issue here is whether the trial court erred in finding that Dr. Hayne's testimony did not meet the Mississippi standards for admissibility. This Court never has held that the defendant's entitlement to an expert witness obviates a determination of the admissibility of the expert's proposed testimony under Mississippi Rule of Evidence 702.
 

 ¶ 24. Pretrial, Dr. Hayne submitted a report to the defense in which he opined that:
 

 The summary of the case would indicate this individual suffered severe facial and head injury secondary to assault resulting in blunt force trauma of a critical nature that was subsequently resolved to the point that he could be discharged from medical care and while in the process of being discharge[d], this individual developed nosocomial infection and died. It seems unlikely that he died from probable aspiration pneumonia as reported in the postmortem examination and that he would have a protected airway with a tracheostomy tube in place. Furthermore, feeding and nutrition was provided through a gastrostomy catheter.
 

 Dr. Hayne said that Jackson's physicians had indicated that he had required "24-hour a day, seven-day a week care and he needed to be in a nursing home."
 

 ¶ 25. During the
 
 Daubert
 
 hearing, Dr. Hayne proffered testimony that Jackson had died from nosocomial pneumonia, or hospital-acquired pneumonia. He maintained that he could discern Jackson's cause of death from Jackson's medical records, which indicated that UMMC had administered "Staph aureus medication," a "specific treatment for Pneumonia, hospital acquired." Dr. Hayne continued that the manner of death was "therapeutic complication," which he agreed is a relatively new manner of death classification. Dr. Hayne stated that "therapeutic complication" is used "in multiple jurisdictions" as a cause of death. He referenced only New Jersey and Connecticut, but then said that use of "therapeutic complication" as a cause of death is "growing very rapidly." Dr. Hayne agreed that "therapeutic complication" as a cause of death never has been accepted by a court.
 

 ¶ 26. The trial court granted the State's motion to exclude Dr. Hayne's testimony, finding it "entirely too speculative to be submitted to the jury in any fashion." The trial court found that Dr. Hayne had not testified to a reasonable degree of medical certainty and that his report "is devoid of any such medical certainty." The trial court referenced Dr. Hayne's use of "uncertain terms such as 'it seems unlikely that [Jackson] died from probable aspiration pneumonia.' " Moreover, the trial court observed that "it is undisputed that the victim was in the hospital strictly because of the severe injuries he sustained during the alleged beating by this defendant."
 

 The defense moved for reconsideration
 
 ore tenus
 
 before its case-in-chief and the trial court denied the motion, reasoning that "Dr. Hayne's opinions were speculative and unsure."
 

 ¶ 27. Here, it is clear from the record that Dr. Hayne's opinions were not offered to a reasonable degree of medical certainty. Dr. Hayne indicated that the "therapeutic complication" cause of death classification never has been accepted in court. The trial court also recognized that Dr. Hayne used "uncertain terms such as 'it seems unlikely that [Jackson] died from probable aspiration pneumonia.' " Accordingly, the trial court cannot be said to have abused his discretion in excluding Dr. Hayne's testimony.
 

 ¶ 28. Further, as discussed in Issue I, we have held that "[t]he unlawful act or omission of accused need not be the sole cause of death. The test of responsibility is whether the act of accused contributed to the death, and, if it did, he is not relieved of responsibility by the fact that other causes also contributed."
 
 Holliday
 
 ,
 
 418 So.2d at 70-71
 
 (quoting
 
 Schroer
 
 ,
 
 250 Miss. at 91
 
 ,
 
 160 So.2d 681
 
 ). Thus, even if the testimony of Dr. Hayne had been deemed admissible, the jury still would have had the authority to convict Thomas. Also, in closing argument, Thomas's counsel did argue to the jury that Jackson was healed of the wounds caused by Thomas when he died from pneumonia. This issue is without merit.
 

 III. Whether the trial court erred by finding Thomas competent to stand trial.
 

 ¶ 29. Thomas argues that he was mentally incompetent to stand trial. "We will reverse a trial court's competency determination only if it is 'manifestly against the overwhelming weight of the evidence.' "
 
 Dickerson v. State
 
 ,
 
 175 So.3d 8
 
 , 15 (Miss. 2015) (quoting
 
 Hearn v. State
 
 ,
 
 3 So.3d 722
 
 , 728 (Miss. 2008) ). The standard for competence to stand trial as defined by the United States Supreme Court asks " 'whether [a defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding ... and whether he has a rational as well as factual understanding of the proceedings against him.' "
 
 Hearn
 
 ,
 
 3 So.3d at 728
 
 (quoting
 
 Dusky v. United States
 
 ,
 
 362 U.S. 402
 
 , 402,
 
 80 S.Ct. 788
 
 ,
 
 4 L.Ed. 2d 824
 
 (1960) ). To be competent to stand trial, a defendant must be one:
 

 (1) who is able to perceive and understand the nature of the proceedings; (2) who is able to rationally communicate with his attorney about the case; (3) who is able to recall relevant facts; (4) who is able to testify in his own defense if appropriate; and (5) whose ability to satisfy the foregoing criteria is commensurate with the severity of the case.
 

 Hearn
 
 ,
 
 3 So.3d at 728
 
 (quoting
 
 Martin v. State
 
 ,
 
 871 So.2d 693
 
 , 697 (Miss. 2004) ).
 

 ¶ 30. At the time of Thomas's trial, Mississippi Uniform Rule of Circuit and County Court Practice 9.06
 
 [3]
 
 provided the following:
 

 If before or during trial the court, of its own motion or upon motion of an attorney, has reasonable ground to believe that the defendant is incompetent to stand trial, the court shall order the defendant to submit to a mental examination by some competent psychiatrist selected by the court in accordance with § 99-13-11 of the Mississippi Code Annotated of 1972.
 

 After the examination the court shall conduct a hearing to determine if the defendant is competent to stand trial. After hearing all the evidence, the court shall weigh the evidence and make a determination of whether the defendant is competent to stand trial. If the court finds that the defendant is competent to stand trial, then the court shall make the finding a matter of record and the case will then proceed to trial.
 

 URCCC 9.06.
 

 ¶ 31. Here, the trial court appointed Dr. Benjamin Root to perform a competency evaluation on Thomas. Dr. Root assessed Thomas on December 12, 2013, and reported "to a reasonable medical certainty that the defendant is incompetent to stand trial at this time." Dr. Root observed that Thomas "cannot work with his attorney and cannot comprehend his legal situation to any reasonable level that would pass constitutional muster.
 

 ¶ 32. On June 17, 2014, the trial court conducted a competency hearing. Dr. Root testified that Thomas suffers from schizoaffective disorder, schizophrenia, and possibly bipolar disorder and that he was not competent to stand trial at that time. Dr. Root was cross-examined with regard to errors in the report he produced, including the defendant's race. Dr. Root stated the date of Thomas's arrest but could not recall where he obtained that information. Dr. Root stated that his interview with Thomas lasted between forty-five minutes and one hour.
 

 ¶ 33. After Dr. Root's testimony at the hearing, the State proposed, and the defense agreed, that Thomas should have another medical examination done at the Mississippi State Hospital at Whitfield, Mississippi. The trial court ordered a second mental evaluation, finding that, after the first hearing, it "was unable to make a determination regarding the defendant's competency to stand trial due to a lack of specificity and information procured from the witness and his report."
 

 ¶ 34. Dr. W. Criss Lott evaluated Thomas on August 15, 2014, and December 21, 2014. Dr. Lott's report indicated that, it was his opinion, "to a reasonable degree of psychological certainty, that Mr. Thomas has a marginal, but sufficient present ability to consult with his attorney with a reasonable degree of rational understanding in perparation [sic] of his defense" and that he "has a rational as well as factual understanding of the nature and object of the legal proceedings against him." Dr. Lott was not called to testify at Thomas's second competency hearing because Thomas's counsel at the hearing conceded Dr. Lott's competency finding. In the absence of an objection or a request to cross-examine Dr. Lott, the trial court found Thomas competent to stand trial.
 

 ¶ 35. Dr. Lott's report thoroughly analyzed each of the applicable factors and concluded that Thomas was competent to stand trial. It cannot be said that the trial court's finding that Thomas was competent to stand trial was against the overwhelming weight of the evidence.
 

 IV. Whether the trial court erred by denying Thomas's motion to recuse the trial judge.
 

 ¶ 36. In January 2015, Thomas's then-counsel, Alison Kelly, sought the recusal of the trial judge. According to Kelly, Circuit Judge Jeff Weill, Sr., had authored a letter to the Hinds County Board of Supervisors asserting "that the appointment [of] private attorneys [was] necessary because the attorney Alison Kelly, attorney of record in the case at bar, is both an incompetent and non law-abiding attorney." Judge Weill had stated in the letter to the Board of Supervisors that " 'good cause' has been shown to preclude
 Ms. Kelly from participating in any matter involving indigent representation in my courtroom ..." and that "I want the board to be aware that Ms. Kelly's failure to comply with the law and the requirements of her position will necessarily result in some additional expense by way of appointment of separate counsel." The trial court denied the motion for recusal.
 

 ¶ 37. In fifty-five cases, including Thomas's, the Hinds County Public Defender's Office (HCPDO) sought to recuse Judge Weill.
 
 In Re:
 

 Office of the Hinds County Public Defender
 
 , No. 2015-M-00397 (Miss. May. 21, 2015). This Court did not "find a sufficient basis for ordering Judge Weill's recusal in any pending or future case."
 

 Id.
 

 This Court, however, found it appropriate "for the HCPDO, should it so desire, to inform each of its previous clients in the fifty-five cases before us, that they may choose to continue with the private counsel Judge Weill has appointed to represent them, or they may choose to have the HCPDO reassume their representation."
 

 Id.
 

 In accordance with this Court's order, Thomas filed an Option of Counsel By Defendant, in which he chose "to return to the Office of the Hinds County Public Defender" instead of continuing "with the private lawyer Judge Weill appointed to my case."
 

 ¶ 38. This Court has held that "[a] judge's determination of recusal is reviewed through the lens of an abuse-of-discretion standard."
 
 Patton v. State
 
 ,
 
 109 So.3d 66
 
 , 77 (Miss. 2012) (citing
 
 Miss. United Methodist Conference v. Brown
 
 ,
 
 929 So.2d 907
 
 , 908 (Miss. 2006) ). " 'This Court applies an objective standard when deciding whether a judge should have disqualified himself.' "
 
 Patton
 
 ,
 
 109 So.3d at 77
 
 (quoting
 
 Jones v. State
 
 ,
 
 841 So.2d 115
 
 , 135 (Miss. 2003) ). " 'On appeal, a trial judge is presumed to be both qualified and unbiased, and this presumption may only be overcome by evidence which produces a reasonable doubt about the validity of the presumption.' "
 

 Id.
 

 ¶ 39. Here, this Court already has found no sufficient basis to order the recusal of Judge Weill.
 
 In Re: Office of the Hinds County Public Defender
 
 , No.2015-M-00397(Miss. May. 21, 2015). The Court did, however, indicate that:
 

 In future cases in which the Hinds County Public Defender or a particular assistant public defender believes Judge Weill-or any circuit judge-should recuse from a particular case, he or she may file with that judge an appropriate motion to recuse, setting forth the particular facts and circumstances that suggest the circuit judge cannot preside impartially over the case.
 

 Id.
 

 After this Court's order, Thomas did not again seek the recusal of Judge Weill. Instead, pursuant to this Court's order, Thomas agreed to retain the Office of the Hinds County Public Defender. We see no reason now to adjust our previous ruling simply because Thomas raises the issue pro-se on direct appeal. Thomas has presented no evidence to create a reasonable doubt as to the validity of the presumption that the trial judge was both qualified and unbiased.
 
 [4]
 
 Thus, we affirm Judge Weill's denial of the motion to recuse.
 

 V. Whether the trial court misapplied
 
 Batson v. Kentucky
 
 ,
 
 476 U.S. 79
 
 ,
 
 106 S.Ct. 1712
 
 ,
 
 90 L.Ed. 2d 69
 
 (1986).
 

 ¶ 40. During
 
 voir dire
 
 , the prosecutor raised a challenge pursuant to
 
 Batson v. Kentucky
 
 ,
 
 476 U.S. 79
 
 ,
 
 106 S.Ct. 1712
 
 ,
 
 90 L.Ed. 2d 69
 
 (1986), arguing that the defense had struck "every available white person tendered ...." For two of the jurors, the trial court determined that the defense's proffered race-neutral explanations were pretextual and granted the State's
 
 Batson
 
 challenges.
 

 ¶ 41. "This Court will overturn a trial court's
 
 Batson
 
 ruling only if it was clearly erroneous or against the overwhelming weight of the evidence."
 
 Hartfield v. State
 
 ,
 
 161 So.3d 125
 
 , 137 (Miss. 2015) (citing
 
 Batiste v. State
 
 ,
 
 121 So.3d 808
 
 , 848 (Miss. 2013) ). "Because a
 
 Batson
 
 ruling is largely based on credibility, we give great deference to the trial court's decision."
 

 Id.
 

 "
 
 Batson
 
 forbids the prosecution from racially discriminating through the use of peremptory challenges."
 
 Hartfield
 
 , 161 So.3d at 137 (citing
 
 Batson
 
 ,
 
 476 U.S. at 89
 
 ,
 
 106 S.Ct. 1712
 
 ).
 

 ¶ 42. This Court and the United States Supreme Court have held that the defense also is precluded from employing peremptory challenges in a racially discriminatory manner.
 
 Hardison v. State
 
 ,
 
 94 So.3d 1092
 
 , 1097 (Miss. 2012) ;
 
 Georgia v. McCollum
 
 ,
 
 505 U.S. 42
 
 , 59,
 
 112 S.Ct. 2348
 
 ,
 
 120 L.Ed. 2d 33
 
 (1992) ("We hold that the Constitution prohibits a criminal defendant from engaging in purposeful discrimination on the ground of race in the exercise of peremptory challenges."). "When the State challenges the defense's use of a peremptory challenge[ ] as racially discriminatory, this Court refers to it as a 'reverse-
 
 Batson
 
 ' challenge."
 
 Hartfield
 
 ,
 
 161 So.3d at 137
 
 (quoting
 
 Hardison
 
 ,
 
 94 So.3d at
 
 1097 ). Three steps guide the trial court's handling of a
 
 Batson
 
 challenge:
 

 First, the party objecting to the peremptory strike of a potential juror must make a prima facie showing that race was the criterion for the strike. Second, upon such a showing, the burden shifts to the State to articulate a race-neutral reason for excluding that particular juror. Finally, after a race-neutral explanation has been offered by the prosecution, the trial court must determine whether the objecting party has met its burden to prove that there has been purposeful discrimination in the exercise of the peremptory strike, i.e., that the reason given was a pretext for discrimination.
 

 Hartfield
 
 , 161 So.3d at 137 (quoting
 
 Pitchford v. State
 
 ,
 
 45 So.3d 216
 
 , 224 (Miss. 2010) ). The United States Supreme Court has held that:
 

 [R]ace-neutral reasons for peremptory challenges often invoke a juror's demeanor (e.g., nervousness, inattention), making the trial court's firsthand observations of even greater importance. In this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor. We have recognized that these determinations of credibility and demeanor lie " 'peculiarly within a trial judge's province,' " and we have stated that "in the absence of exceptional circumstances, we would defer to [the trial court]."
 

 Hartfield
 
 , 161 So.3d at 138-39 (quoting
 
 Snyder v. Louisiana
 
 ,
 
 552 U.S. 472
 
 , 477,
 
 128 S.Ct. 1203
 
 ,
 
 170 L.Ed. 2d 175
 
 (2008) ).
 

 ¶ 43. In
 
 Hartfield
 
 , the trial court evaluated the defense's proffered race-neutral reason for the strike, that a prospective white juror "had been asleep during voir dire."
 
 Hartfield
 
 , 161 So.3d at 139. The defense had exercised its "first seven peremptory strikes on white jurors, while accepting all African-American jurors tendered."
 
 Id.
 
 at 138. The trial court in that case determined that the proffered race-neutral reason for the prospective juror's exclusion was pretext, having himself observed that the prospective juror "had not been sleeping, but had yawned and closed his eyes ...."
 
 Id.
 
 at 139.
 

 ¶ 44. Here, the trial court found that the State had made a
 
 prima facie
 
 case that the defense had engaged in race discrimination in jury selection. The court then asked defense counsel "to state a non-race, non-gender or non-religious based reason" to justify the peremptory strikes.
 

 ¶ 45. With regard to Loicka Hodges, the first white juror struck by the defense, Defense counsel said that she did not bow her head to pray with the other venire members when the trial court had offered a prayer earlier in the proceedings. Defense counsel also pointed out that Hodges had been born in France and had spent thirty "or so years of her life in France." Defense counsel expressed concern with regard to the "possible distinction she's going to make between the laws of France versus the laws of the United States." Finally, defense counsel stated that Hodges had not participated in
 
 voir dire
 
 "in almost any fashion" and that he "didn't really get any answers from her." The trial court granted the State's
 
 Batson
 
 challenge and allowed Hodges to sit as a juror.
 

 ¶ 46. Defense counsel stated that Edward Milam, the second prospective white juror struck, had not spoken during
 
 voir dire
 
 by the State or by the defense: "since he never talked[,] the unknown is so large." According to defense counsel, Milam worked at McNeely Plastics, possibly as a tradesman. Defense counsel continued: "if he is a tradesman, I don't want a juror placing themselves in the shoes of the victim in this case ...." Defense counsel stated, "I don't know if [Milam] was paying attention during voir dire. But I know he did not participate." The trial court found the defense's justification for the strike to have been pretextual and that the defense "was engaged in purposeful discrimination."
 

 ¶ 47. Defense counsel argued that he struck Danny Fultz, the third prospective white juror, because of his work as a machinist at Eaton Aerospace. The victim in the case was a welder and was welding at the time of the attack. Defense counsel also mentioned that "we brought him back" and "[h]e gave us some more information." When "brought back," Fultz had informed the court and the lawyers that his father had been a victim of "an investor [who] cheated him out of some money" and that, due to his father's experience," he "hope[d]" that he could be impartial. The trial court allowed the defense to strike Fultz.
 

 ¶ 48. Evidence in the record supports the trial court's determination that the defense's proffered race-neutral reasons for striking the jurors were pretextual. As to Hodges, the trial court did not accept defense counsel's proposed reason that Hodges kept her eyes open during the initial prayer as a legitimate race-neutral reason. Also, in regard to Milam, the trial court noted that defense counsel did not strike a number of other jurors who had not spoken during voir dire. Further, the record reveals that the trial court resolved the
 
 Batson
 
 challenge against Fultz in
 Thomas's favor. After review of the record, we cannot say that the decision of the trial court to include Hodges and Milam on Thomas's jury is clearly erroneous or against the overwhelming weight of the evidence. We defer to the judgment of the trial court. This issue is without merit.
 

 VI. Whether the trial court abused its discretion in instructing the jury.
 

 ¶ 49. "This Court reviews the grant or denial of jury instructions for abuse of discretion."
 
 Hale v. State
 
 ,
 
 191 So.3d 719
 
 , 723 (Miss. 2016) (citing
 
 Victory v. State
 
 ,
 
 83 So.3d 370
 
 , 373 (Miss. 2012) ). " 'A defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.' "
 
 Hale
 
 ,
 
 191 So.3d at 723
 
 (quoting
 
 Newell v. State
 
 ,
 
 49 So.3d 66
 
 , 73 (Miss. 2010) ). "A lesser offense is necessarily included in the greater offense if the elements of the greater offense include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser."
 
 Hye v. State
 
 ,
 
 162 So.3d 750
 
 , 754 (Miss. 2015) (citing
 
 Porter v. State
 
 ,
 
 616 So.2d 899
 
 , 909-10 (Miss. 1993) (Hawkins, J., specially concurring) ).
 

 A. Whether the trial court abused its discretion by denying proffered defense instructions
 
 .
 

 ¶ 50. Thomas claims on appeal that the trial court erred by denying instructions the defense had sought defining various offenses, which he contends constituted lesser-included offenses to capital murder. Instructions D-5 and D-6 informed the jury that if the State had failed to prove any element of capital murder beyond a reasonable doubt, the jury should consider either aggravated assault (D-5) or culpable-negligence manslaughter (D-6). Instruction D-14 defined aggravated assault. Instruction D-16 was a heat-of-passion manslaughter instruction. Instruction D-17 was a form of the verdict instruction informing the jury how it should style its verdict if it found Thomas not guilty of capital murder, murder, manslaughter, or aggravated assault.
 

 ¶ 51. First, as to the instructions for aggravated assault, "[t]he law in Mississippi is that aggravated assault is not a lesser-included offense within the crime of murder."
 
 Johnson v. State
 
 ,
 
 512 So.2d 1246
 
 , 1251 (Miss. 1987) (citing
 
 Scott v. State
 
 ,
 
 60 Miss. 268
 
 (1882) ),
 
 overruled on other grounds by
 

 Smith v. State
 
 ,
 
 986 So.2d 290
 
 (Miss. 2008). Thus, Thomas was not entitled to an instruction on aggravated assault.
 

 ¶ 52. Second, as to the remaining instructions for culpable-negligence and heat-of-passion manslaughter, Thomas was not entitled to them as the evidence did not support the instructions.
 
 [5]
 
 Thomas admitted in his oral and written statements to having hit Jackson with a welding rod in an effort to steal Jackson's money. No evidence supported a determination of negligence or heat of passion.
 

 ¶ 53. Therefore, the trial court did not abuse its discretion in denying the jury instructions proffered by defense counsel. We affirm on this issue, as it is without merit.
 

 B. Whether the trial court erred when it refused to instruct the jury on the elements of robbery.
 

 ¶ 54. Citing
 
 Harrell v. State
 
 ,
 
 134 So.3d 266
 
 (Miss. 2014), Thomas argues that the trial Court abused its discretion by not instructing the jury on the elements of robbery which constituted the underlying felony of his capital-murder charge. As discussed below though, Thomas's defense counsel requested that the trial court not instruct the jury on the elements of robbery.
 

 ¶ 55. It is axiomatic that "a defendant cannot complain on appeal of alleged errors invited or induced by himself."
 
 Galloway v. State
 
 ,
 
 122 So.3d 614
 
 , 645 (Miss. 2013) ;
 
 O'Connor v. State
 
 ,
 
 120 So.3d 390
 
 , 397 (Miss. 2013) ;
 
 Singleton v. State
 
 ,
 
 518 So.2d 653
 
 , 655 (Miss. 1988). Further, "a defendant cannot complain of an instruction which he, not the state, requested."
 
 Harris v. State
 
 ,
 
 861 So.2d 1003
 
 , 1015 (Miss. 2003) ;
 
 Buford v. State
 
 ,
 
 372 So.2d 254
 
 , 256 (Miss. 1979).
 

 ¶ 56. An excellent analysis of these principles in an almost identical fact pattern can be found in
 
 State v. Hargrove
 
 ,
 
 48 Kan.App.2d 522
 
 ,
 
 293 P.3d 787
 
 (2013). The
 
 Hargrove
 
 case effectively lays out the basis for the rule, stating that the purpose is to "bind[ ] trial counsel to strategic decisions inducing judicial rulings with the purpose of obtaining favorable judgments for their client."
 
 Hargrove
 
 ,
 
 293 P.3d at 795
 
 . The rule "also defeats the disreputable strategy aimed at requesting a judge act in a particular way to salt the record with error as an end in itself, thereby providing potential grounds for reversal of an adverse judgment."
 

 Id.
 

 ¶ 57. A multitude of courts have applied this doctrine in the context of jury instructions.
 
 People v. Zapata
 
 ,
 
 779 P.2d 1307
 
 , 1308-09 (Colo. 1989) ("The allegation of constitutional error in the jury instruction does not require us to abandon the strict preclusion of review of invited error");
 
 State v. Madigosky
 
 ,
 
 291 Conn. 28
 
 ,
 
 966 A.2d 730
 
 (2009) ;
 
 State v. Perdue
 
 ,
 
 813 P.2d 1201
 
 , 1206 (Utah App. 1991) ;
 
 State v. Henderson
 
 ,
 
 114 Wash.2d 867
 
 ,
 
 792 P.2d 514
 
 , 515 (1990) (recognizing that less-than-strict application of the invited-error rule to jury instructions "would put a premium on defendants misleading trial courts....");
 
 United States v. Askew
 
 ,
 
 403 F.3d 496
 
 , 505-06 (7th Cir. 2005) (finding that, where a defendant is aware of the omitted element in a jury instruction and yet relinquished his right to have it presented to the jury, the doctrine of invited error applies);
 
 see also
 

 United States v. Perez
 
 ,
 
 116 F.3d 840
 
 , 845 (9th Cir. 1997) ). A number of the cases that held otherwise based their decisions on the actions of defense counsel being inadvertent, negligent, or without strategic or tactical grounds.
 
 People v. Bender
 
 ,
 
 20 Ill.2d 45
 
 ,
 
 169 N.E.2d 328
 
 , 333 (1960) (declining to apply the invited-error doctrine "[w]hen the State, the defense, and the court, all proceeded on an entirely erroneous belief ....");
 
 State v. Dozier
 
 ,
 
 163 W.Va. 192
 
 ,
 
 255 S.E.2d 552
 
 , 555 (1979) ("[I]t would be a travesty of justice to hold the accused invited the error ... [as] it clearly appears ... that the instruction was an unfortunate mistake."). Mississippi has applied the invited-error doctrine to jury instructions in
 
 Harris
 
 and
 
 Buford
 
 .
 
 Harris
 
 ,
 
 861 So.2d at
 
 1015 ;
 
 Buford
 
 ,
 
 372 So.2d at 256
 
 .
 

 ¶ 58. It is important to note what this case is not. This is not a case in which the defendant successfully objected to the language
 of an elements instruction and the court neglected to correct the error or substitute language. Neither is this a case in which the State successfully objected to the language of an instruction to which the defendant was otherwise entitled and the court failed to substitute appropriate language.
 
 See
 

 Hunter v. State
 
 ,
 
 684 So.2d 625
 
 (Miss. 1996). Finally, this is not a case in which a defendant negligently or inadvertently failed to object to a flawed elements instruction.
 
 See
 

 Harrell v. State
 
 ,
 
 134 So.3d 266
 
 (Miss. 2014). Instead, it is a case in which the error might more appropriately be referred to as "demanded" by the defendant rather than "invited."
 

 ¶ 59. In this case, the State offered Instruction S-2, which properly and appropriately set out the elements of capital murder and specifically referred the jury to Instruction S-3. Instruction S-3 properly and appropriately set out the elements of robbery. Defense counsel, after initially stating he had no objection, backtracked and objected to Instruction S-3. He noted, correctly, that in the indictment there was "no charge for robbery," as the commission of robbery was merely an element of capital murder. Defense counsel made clear that there was no mistake. He acknowledged that robbery was listed in the indictment. The Court then requested counsel to explain the objection further. Defense counsel referred to the additional instruction as confusing and complained that it treats robbery as a "second count." The State then agreed to withdraw the instruction. However, defense counsel once again inquired to be sure it had been withdrawn and, upon receiving an affirmative response, stated "All right. That's all I needed to know. I'm sorry." The Court later proceeded to amend Instruction S-2, to remove the reference to Instruction S-3, and renamed it Instruction S-2B. In response to the Court's explanation, defense counsel stated, "I'm clear now your honor. No objection."
 

 ¶ 60. The record demonstrates that defense counsel's successful objection to Instruction S-3 was a tactical decision. He acted with full knowledge of the consequences. He did not want the jury instructed on the elements of robbery. He felt that the instruction would be confusing to the jurors, misleading them into believing the defendant was charged with a second count. The tactical decision, whether wise or not, is further brought home in defense counsel's closing argument in which he stated the defendant had admitted that he had committed the crime of robbery and used it to support the defendant's credibility on the capital-murder issue in which he argued that "The State can't pick and choose what they want you to believe."
 
 [6]
 

 ¶ 61. Persons may relinquish their constitutional rights if they do so knowingly and voluntarily. Criminal defendants are no exception.
 
 [7]
 
 Further, the waiver
 need not be affirmatively reflected in the record.
 
 Robinson v. State
 
 ,
 
 345 So.2d 1044
 
 , 1045 (Miss. 1977).
 

 ¶ 62. Likewise, with certain exceptions, criminal defendants are bound by the actions of their lawyers.
 
 Hill
 
 , 528 U.S. at 114-15,
 
 120 S.Ct. 659
 
 . Jury instructions, unless explicitly opposed or insisted upon by the client, are left to the sound professional judgment of the attorney.
 
 Perez
 
 ,
 
 116 F.3d at 845
 
 . In fact, lawyers may compromise their clients' constitutional rights.
 
 See
 

 Taylor v. Illinois
 
 ,
 
 484 U.S. 400
 
 , 410-16,
 
 108 S.Ct. 646
 
 ,
 
 98 L.Ed. 2d 798
 
 (1988) (affirming the application of a preclusion sanction where it is determined that "a party's failure to comply with a request to identify his or her witnesses in advance of trial ... was willful and motivated by a desire to obtain a tactical advantage....").
 
 [8]
 

 ¶ 63. The dissent relies on the language contained in
 
 Harrell v. State
 
 ,
 
 134 So.3d 266
 
 (Miss. 2014), and other cases, for the proposition that "it is the trial court's responsibility to assure that the jury is 'fully and properly instructed on all issues relevant to the case.' "
 
 Harrell
 
 ,
 
 134 So.3d at 270
 
 . We absolutely and without reservation agree with this legal tenet.
 
 Harrell
 
 , though, does not control here. As discussed above, defense counsel invited this error.
 

 ¶ 64. Further, the State met its burden to instruct the jury by submitting proper instructions as to both the elements of capital murder and the underlying crime of robbery.
 
 See
 

 Reddix v. State
 
 ,
 
 731 So.2d 591
 
 , 592 (Miss. 1999) ("Because it is the State's duty to prove every element of the crime beyond a reasonable doubt, the State also has a duty to make sure the jury is properly instructed with regard to the essential elements of the crime.") Once defense counsel strongly objected to the instructions, the State acquiesced. In the end, the trial judge accepted their communal position and gave an instruction that lacked the elements of the underlying crime. Trial courts expect and deserve guidance from the attorneys as to jury instructions. It is common practice for trial judges to accept agreements between the parties as to such issues, as it is assumed that the agreement is made for the mutual benefit of the parties or as a contemplated concession.
 

 ¶ 65. While the trial court would have been within its authority to insist on instructing the jury on the elements of the underlying felony, we decline to find any error. A reversal is not required where the trial court and the State both acted to properly instruct the jury, but the defendant-in a tactical decision-objected to the instruction. A defendant cannot object to an elements instruction, succeed on the
 objection, use that success to minimize the issue to a jury, bolster his own credibility with the success of the objection, and then cry error and complain about the lack of an elements instruction on appeal. The invited-error doctrine prohibits us from considering the issue. Thus, we affirm.
 

 VII. Whether cumulative error requires reversal.
 

 ¶ 66. "The cumulative error doctrine provides that 'where one error, standing alone, may not warrant reversal, reversal may be required if the errors, taken together, "create such an atmosphere of bias, passion, and prejudice that they effectively deny the defendant a fundamentally fair trial." ' "
 
 Jones v. State
 
 ,
 
 203 So.3d 600
 
 , 617 (Miss. 2016) (quoting
 
 Dickerson v. State
 
 ,
 
 175 So.3d 8
 
 , 35 (Miss. 2015) (quoting
 
 Flowers v. State
 
 ,
 
 158 So.3d 1009
 
 , 1075 (Miss. 2014) ) ). After a review of the record and the issues brought before us by Thomas and his counsel, we find that the trial court did not err. Therefore, the cumulative-error doctrine does not apply to this case.
 

 CONCLUSION
 

 ¶ 67. For the above reasons, we affirm Thomas's conviction and sentence.
 

 ¶ 68.
 
 AFFIRMED.
 

 WALLER, C.J., RANDOLPH, P.J., COLEMAN, MAXWELL AND BEAM, JJ., CONCUR. KITCHENS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING AND ISHEE, JJ.
 

 Miranda v. Arizona
 
 ,
 
 384 U.S. 436
 
 ,
 
 86 S.Ct. 1602
 
 ,
 
 16 L.Ed. 2d 694
 
 (1966).
 

 Daubert v. Merrell Dow Pharms., Inc.
 
 ,
 
 509 U.S. 579
 
 ,
 
 113 S.Ct. 2786
 
 ,
 
 125 L.Ed. 2d 469
 
 (1993).
 

 This provision since has been replaced by Mississippi Rule of Criminal Procedure 12.2, which became effective July 1, 2017. For purposes of this case, Mississippi Uniform Rule of Circuit and County Court Practice 9.06 applies.
 

 Now on direct appeal, in order to demonstrate "the malice this trial court judge holds for most members of the Hinds County Public Defender's Office," Thomas asks this Court to take judicial notice of
 
 Routh v. State
 
 ,
 
 227 So.3d 959
 
 , 960 (Miss. 2017). In
 
 Routh
 
 , Judge Weill held Christopher Routh, an assistant public defender with the Hinds County Public Defender's Office, in direct criminal contempt.
 
 Routh
 
 , 227 So.2d at 961. This Court affirmed Judge Weill's decision, holding that "[d]isrupting the court by disrupting a judge's ruling-after being expressly told not to-supports a finding of criminal contempt."
 
 Id.
 
 at 963. A finding of direct criminal contempt in an unrelated case has no bearing on whether Judge Weill should have recused in the present case.
 

 Culpable-negligence manslaughter is the "killing of a human being, by the act, procurement, or culpable negligence of another, and without authority of law ...."
 
 Miss. Code Ann. § 97-3-47
 
 (Rev. 2014). Heat-of-passion manslaughter is "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a deadly weapon, without authority of law, and not in necessary self-defense...."
 
 Miss. Code Ann. § 97-3-35
 
 (Rev. 2014).
 

 If defense counsel's objection to Instruction S-3 was not a tactical decision, the defendant is not without recourse. As in any case in which the defendant alleges that his counsel was ineffective, the defendant may file a petition for post-conviction relief.
 
 Miss. Code Ann. § 99-39-1
 
 -29 (Rev. 2015).
 

 Maryland v. Shatzer
 
 ,
 
 559 U.S. 98
 
 , 103-04,
 
 130 S.Ct. 1213
 
 , 1219,
 
 175 L.Ed. 2d 1045
 
 (2010) (self-incrimination);
 
 New York v. Hill
 
 ,
 
 528 U.S. 110
 
 , 114-15,
 
 120 S.Ct. 659
 
 ,
 
 145 L.Ed. 2d 560
 
 (2000) (acknowledging criminal defendant may waive even fundamental rights);
 
 Faretta v. California
 
 ,
 
 422 U.S. 806
 
 , 835,
 
 95 S.Ct. 2525
 
 ,
 
 45 L.Ed. 2d 562
 
 (1975) (right to counsel). For example, an individual, having been advised in accordance with
 
 Miranda v. Arizona
 
 ,
 
 384 U.S. 436
 
 ,
 
 86 S.Ct. 1602
 
 ,
 
 16 L.Ed. 2d 694
 
 (1966), may give up the right against self-incrimination and submit to a custodial police interrogation.
 
 Shatzer
 
 ,
 
 559 U.S. at 103-112
 
 ,
 
 130 S.Ct. 1213
 
 . And criminal defendants may forgo their constitutional right to counsel to represent themselves.
 
 Faretta
 
 ,
 
 422 U.S. at 835
 
 ,
 
 95 S.Ct. 2525
 
 . But they may not later complain about adverse consequences resulting from their own conduct in waiving those rights.
 
 Faretta
 
 ,
 
 422 U.S. at 834-35, n.46
 
 ,
 
 95 S.Ct. 2525
 
 ("[W]hatever else may or may not be open to him on appeal, a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.' ");
 
 Illinois v. Allen
 
 ,
 
 397 U.S. 337
 
 , 342-43,
 
 90 S.Ct. 1057
 
 ,
 
 25 L.Ed. 2d 353
 
 (1970) (criminal defendant may lose Sixth Amendment right to be present at trial by continuing disruptive conduct despite trial judge's warning that persistence will result in removal). These same principles are embedded in Mississippi law.
 
 Roberts v. State
 
 ,
 
 234 So.3d 1251
 
 , 1258-62 (Miss. 2017) (self-incrimination);
 
 Baxter v. State
 
 ,
 
 177 So.3d 394
 
 , 403-06 (Miss. 2015) (self-incrimination);
 
 Conn v. State
 
 ,
 
 251 Miss. 488
 
 ,
 
 170 So.2d 20
 
 , 21-23 (1964) (right to counsel).
 

 With slight modifications to adapt the analysis, the preceding two paragraphs are adopted from the analysis in
 
 Hargrove
 
 .
 
 Hargrove
 
 ,
 
 293 P.3d at 796
 
 .